James **TEPPERWIEN**, Plaintiff,

v.

**ENTERGY NUCLEAR OPERATIONS, INC.**, Defendant.

**No. 07–CV–433 (CS).**

United States District Court, S.D. New York.

March 27, 2009.

Nina Berry Gerosa, Esq., Gerosa & VanderWoude, Carmel, NY, for Plaintiff.

Robert P. Heary, Esq., Alan R. Peterman, Esq., Hiscock & Barclay, Syracuse, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

SEIBEL, District Judge.

### INTRODUCTION

Plaintiff commenced this action against his former employer, Entergy Nuclear Operations, Inc. ("Entergy"), on January 19, 2007, alleging that repeated incidents of same-sex sexual harassment at the workplace, and Entergy's failure to take appropriate steps in response thereto, constitute a violation of Title VII, 42 U.S.C. § 2000e.[1] On March 31, 2008, Defendant moved for summary judgment, arguing that Plaintiff is unable, as a matter of law, to establish a *prima facie* case of hostile work environment, retaliation, or constructive discharge. (Doc. 41.) For the reasons stated below, Entergy's motion is DENIED in part and GRANTED in part.

---

1. Plaintiff named additional defendants and alleged additional claims in his original and amended Complaints, (Docs. 1, 2), but all claims except the Title VII claim against Entergy were dismissed by the Honorable Charles L. Brieant, to whom the case was then assigned. (Docs. 27, 31.) Judge Brieant passed away on July 20, 2008. The case was reassigned to me on August 5, 2008. (Doc. 59.)

## I. *Background*

Entergy owns and operates several nuclear power plants located throughout the northeastern United States, including the Indian Point Unit 2 and Indian Point Unit 3 plants located at the Indian Point Energy Center ("IPEC") in Buchanan, New York. (Defendant's Statement of Material Facts ("Def.'s Statement") ¶ 1.) Plaintiff was employed by Entergy as a security officer. (Def.'s Statement ¶¶ 8–11.) At the heart of Plaintiff's claim lies the alleged misconduct of Vito Messina, also an IPEC security officer with Entergy. During his roughly three-and-a-half year tenure with Entergy, Plaintiff Tepperwien reported two incidents of sexual harassment, described below, against Messina. (Def.'s Statement ¶¶ 24, 39.) The first, which allegedly occurred in November 2004, resulted in no discipline of Messina, but all IPEC security officers were required to read and sign a memorandum reinforcing Entergy's no-tolerance policy regarding discrimination, harassment and retaliation, and to attend training which included a review of Entergy's Harassment Prevention policy. (Def.'s Statement ¶¶ 35–36.) Messina was also removed from a temporary weapons instructor position, though Plaintiff disputes whether that change was a result of his complaint. (Plaintiff's Statement of Material Facts ("Pl.'s Statement") ¶ 37.) The second incident, allegedly occurring in August 2005, resulted in Messina being placed on paid administrative leave for 10 weeks and receiving a formal reprimand in the form of a "Letter of Discipline." (Def.'s Statement ¶¶ 43, 54.) Though Plaintiff contends Entergy did not take sufficient steps in response to his allegations of harassment, he does not dispute that all Entergy employees receive training regarding Entergy's Harassment Prevention Policy, (Def.'s Statement ¶ 15), and that Entergy provides its employees with various avenues to report claims of inappropriate conduct or harassment.[2] (Def.'s Statement ¶ 16.)

On or around January 7, 2006, shortly after Messina returned to work over Plaintiff's objections, Plaintiff was questioned by two lieutenants regarding his failure to report missing equipment. (Pl.'s Am. Compl. ¶ 32; Def.'s Statement ¶ 123.) One week after the alleged infraction, Plaintiff filed a complaint with the NRC, alleging safety violations and also describing Messina's alleged harassment. (Pl.'s Statement ¶¶ 55, 119; Def.'s Statement ¶¶ 55, 119.) Approximately one week later, Plaintiff was subjected to a disciplinary proceeding in which he was given a "counseling" on the basis of his failure to report the missing equipment. (Pl.'s Am. Compl. ¶ 32; Def.'s Statement ¶ 123.) Plaintiff later sought review of this counseling, and on March 6, 2006, received a letter rescinding the counseling. (*See* Pl.'s Statement ¶ 128; Def.'s Statement ¶ 128.) Shortly after the counseling, on or around February 1, 2006, Plaintiff was questioned by counsel for Entergy regarding some of the allegations in his complaint to the NRC. (Pl.'s Am. Compl. ¶ 33; Pl.'s Statement ¶ 126; Def.'s Statement ¶ 126.)

In February or March of 2006,[3] some time after Plaintiff was questioned by

---

**2.** Entergy employees can report any misconduct to supervisors or managers (Def.'s Statement ¶ 17), human resources, (Def.'s Statement ¶ 18), Entergy's Employee Concerns Program (Def.'s Statement ¶ 19), through an online reporting system or an ethics hotline (Def.'s Statement ¶ 20), to union stewards (Def.'s Statement ¶ 21), or directly to the Nuclear Regulatory Commission ("NRC") (Def.'s Statement ¶ 22). *See also* Deposition of James Tepperwien ("Tepperwien Dep. Tr.") 92:21–23 ("[T]here were—in this industry, there were always avenues for you to follow up.").

**3.** Plaintiff's Amended Complaint provides both months as the date the charge was filed. (*See* Pl.'s Am. Compl. ¶¶ 11, 34.)

counsel for Entergy about the NRC complaint, Plaintiff filed a charge of sexual harassment with the Equal Employment Opportunity Commission ("EEOC"). He received a "right to sue" letter on October 24, 2006. (Plaintiff's Amended Complaint ("Pl.'s Am. Compl.") ¶¶ 11–12.) By letter dated September 3, 2006, Plaintiff informed Entergy of his resignation, providing two weeks notice. (Def.'s Statement ¶ 62.) · An exit survey completed by Plaintiff made no mention of the alleged harassment, with Plaintiff indicating his reason for leaving as a desire for more flexible hours with a new employer. (*Id.* ¶ 63.) Plaintiff further noted he had a good working relationship with his supervisor, was satisfied overall with his job at Entergy, and would consider working for the company again in the future. (*Id.*)

## A. The First Alleged Incident

In late November 2004, Plaintiff contacted Teamsters Local 456 Chief Steward Patrick O'Hara to report an alleged incident involving Messina. Plaintiff alleged that on or around November 10, 2004, Messina sexually assaulted him at a security command post by pushing Plaintiff against the wall, grabbing Plaintiff's buttocks and "driving his nails" in before fleeing through the security turnstile. (Tepperwien Dep. Tr. 146:4–6.) Plaintiff further alleges that Messina intentionally perpetrated this assault beyond security camera range and at a time there would be no witnesses. (Pl.'s Statement ¶ 81.) O'Hara referred the matter to Stephen Downes, Entergy's Human Resources ("HR") Manager at IPEC. In early December 2004, Grace Sanseverino, a senior HR representative at Entergy, interviewed Plaintiff. According to Plaintiff, Sanseverino encouraged him to ask for anonymity in connection with his complaint, but did not explain that anonymity would result in a less thorough investigation. (Tepperwien Dep. Tr. 183:21–186:4.)

Sanseverino prepared a report documenting her investigation into the incident (Affidavit of Grace Sanseverino in Support of Entergy's Motion for Summary Judgment Exh. 6 (the "Sanseverino Report")), that contains Plaintiff's account of the alleged assault (which, according to the report, occurred on November 16, 2004). Plaintiff alleged that while he was on the phone with his wife, "suddenly from behind SO [security officer] Vito Messina grabbed my private parts and ran." (Sanseverino Report 1.) Although not mentioned in the Sanseverino Report, Sanseverino's notes reflect that Plaintiff also told her that Messina had made a comment in front of other people about "trying a man," and had told Plaintiff that Plaintiff "turned [Messina] on." (Ex. K to Affidavit of Nina Berry Gerosa in Opposition to Entergy's Motion for Summary Judgment.) Sanseverino investigated the alleged assault by interviewing Messina and several other security personnel. To protect Plaintiff's anonymity—according to Sanseverino, Plaintiff expressed concern about retaliation and requested anonymity (Deposition of Grace Sanseverino 22:17–23:17)—the interviewees were asked only general questions regarding observation of or participation in any inappropriate sexual behavior. Messina emphatically denied having "ever been involved recently or in the past in a situation where he either touched or grabbed someone (not specifically a female) inappropriately or in private areas," adding that while such behavior "probably" occurred in the security department, · he did not "do that" and would "have to report" such inappropriate behavior if he witnessed it. (Sanseverino Report 2.)

Three courses of action were taken in response to Tepperwien's complaint, though "no discipline" was given Messina, "a 24 year employee with no past history of harassment … based solely upon Mr. Tepperwien's concern." (Sanseverino Re-

port 3.) First, a memorandum was circulated to IPEC security personnel on February 2, 2005, advising them that "each of us must respect every individual's dignity and well being [sic] . . . . [d]iscrimination, harassment and retaliation will not be tolerated." (*See* Exh. 8 to Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.").) Appended to a copy of this memorandum is a list of signatures, including Messina's, signifying that each signer "read and underst[oo]d" the items set forth in the memo. (*Id.*) Second, Messina was "removed from his temporary support role as instructor position at the [rifle] range." (Sanseverino Report 3–4; Messina Dep. Tr. 59:3–7; 62:3–15.) Third, all Entergy security officers were required to attend a mandatory training that included a review of the company's harassment prevention policy. (*See* Def.'s Statement ¶ 36; Messina Dep. Tr. 83:12–23.) According to the Sanseverino Report, Tepperwien "understood the actions taken and was very grateful and appreciative of how this was handled." (*Id.* at 4.)

Plaintiff alleges that Sanseverino's investigation was insufficient in that she failed to check card reader records or interview other security officers to corroborate Plaintiff's account of Messina's presence in the area where the assault occurred. (Pl.'s Statement ¶ 108.)

**B. The Second Alleged Incident**

About nine months after the first alleged incident, in August 2005, Plaintiff reported to his direct supervisor, John Cheribini, that Messina made sexually charged remarks and stroked Plaintiff's hair and neck during a ride in a security car. (Def.'s Statement ¶ 39.) Messina was interviewed by Cheribini, who reported the incident to Terrence Barry, Entergy's Manager of Security. (Def.'s Statement ¶¶ 40–42.) The day after the report was made, Messina was sent home and placed on paid administrative leave. (Def.'s Statement ¶ 43.) Barry sent a memorandum to Entergy's Fitness for Duty Officer, Sharon Quinn, recommending that Messina be "referred out" for a psychological evaluation to ensure he was fit for duty as a security officer at a nuclear facility. (Def.'s Statement ¶ 44; Ex. 9 to Def.'s Mem.) Messina remained on paid leave for 10 weeks, and returned to work after a psychological evaluation confirmed he was fit for duty. (Def.'s Statement ¶ 51.) Messina was issued a "Letter of Discipline" informing him that failure to comply with Entergy's Harassment Prevention Policy would result in his termination. (Def.'s Statement ¶ 54; Ex. 10 to Def.'s Mem.) These steps were unacceptable and unsatisfactory to Plaintiff, who wanted Messina fired. (Tepperwien Dep. Tr. 214:7–10.)

**C. Other alleged incidents involving Messina**

Plaintiff alleges that a number of other incidents involving Messina contributed to a hostile work environment at Entergy. These alleged incidents, laid out in Plaintiff's opposition papers, include:

- Messina's questioning of Plaintiff, before a group of fellow security officers at the rifle range, on whether Plaintiff would have sex with a man. (Pl.'s Statement ¶ 66.)

- A suggestive conversation in which Messina remarked that he and Plaintiff "should see each other," that they "could be really good friends," and that Messina could "take care of [Plaintiff] on the site" and "get [Plaintiff] real easy jobs." (Tepperwien Dep. Tr. 113:22–114:6.)

- A conversation in which Messina approached Plaintiff after an argument and whispered "Why can't I excite

you? Don't you ever get sexually excited?" (Pl.'s Statement ¶ 68.)

- Messina's remark to a group of officers preparing for a tactical exercise that "we have to get going because Mr. Tepperwien is turning me on." (Pl.'s Statement ¶ 69.)

- An attempt by Messina to grab Patrick O'Hara's groin, early in O'Hara's employment as a security officer. (Pl.'s Statement ¶ 75; Deposition of Patrick O'Hara ("O'Hara Dep. Tr.") 35:22–36:2.)

Plaintiff alleges additional instances of Messina's sexual harassment of others, but absent firsthand support in the record, such instances constitute hearsay and cannot appropriately be considered on a motion for summary judgment. *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (hearsay statement is not competent evidence and not proper for court to consider on summary judgment motion).

## II. *Discussion*

### A. Summary judgment standard

Summary judgment is warranted when the moving party shows that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). "A dispute about a genuine issue exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.2008) (internal quotation marks omitted). Accordingly, the trial court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir.2001). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," as Entergy has, "the movant may

satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). These standards apply in the Title VII context. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases … the salutary purposes of summary judgment— avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to … other areas of litigation." (internal quotation marks omitted)); *see also Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir.2008) ("Even in the discrimination context … a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

### B. Hostile Work Environment

■ In order to establish a *prima facie* claim of sexual harassment based on a hostile work environment, a plaintiff must prove "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir.2004) (internal quotation marks omitted). The first element of a hostile work environment claim contains both an objective and subjective compo-

nent. *Id.* The alleged misconduct "must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003) (internal quotation marks omitted). "There is *no* fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment...." *Alfano v. Costello,* 294 F.3d 365, 379 (2d Cir.2002). Rather, in assessing a hostile work environment claim, the court "must determine the existence of sexual harassment in light of the record as a whole and the totality of [the] circumstances." *Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir.2001) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). It must do so "on a case by case basis considering all the individual facts at hand," *Schiano v. Quality Payroll Systems, Inc.,* 445 F.3d 597, 607 (2d Cir.2006), and while "isolated incidents [of harassment] ordinarily will not rise to the level of a hostile work environment, even a single incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment." *Patterson v. County of Oneida,* 375 F.3d 206, 227 (2d Cir.2004); *see Mathirampuzha v. Potter,* 548 F.3d 70, 79 (2d Cir.2008) (for single incident to suffice, "the incident [must] constitute an 'intolerable alteration' of the plaintiff's working conditions, so as to substantially interfere with or impair his ability to do his job." (citation omitted)).

■ This Court looks to "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson,* 232 F.3d 83, 88 (2d Cir.2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The court's inquiry into the "totality of the circumstances" encompasses not only reported acts of harassment committed against a plaintiff, but also unreported incidents of harassment. *See Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998) ("[T]he fact that the incidents were or were not reported is irrelevant to a determination of whether or not a hostile environment existed."). Indeed, at the summary judgment stage, unreported incidents of harassment "stand on the same footing as reported incidents; both must be taken as true." *Id.* In addition to unreported incidents, the court may also consider acts committed against the plaintiff's coworkers. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000) ("[A] plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."); *accord Schwapp v. Town of Avon,* 118 F.3d 106, 111–12 (2d Cir.1997) (plaintiff's second-hand knowledge of racially derogatory comments or jokes can impact work environment); *see also Hawkins v. Anheuser–Busch, Inc.,* 517 F.3d 321, 336–38 (6th Cir.2008) (considering "other-act evidence" in assessing the viability of the plaintiff's hostile work environment claim). But, of course, "only admissible evidence need be considered ... in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997).

■ The question of whether the alleged conduct was so "severe or pervasive" as to create an objectively hostile or abusive work environment is decided in light of such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Patterson,* 375 F.3d at 227 (internal quota-

tion marks omitted); *see Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (non-exhaustive list of factors court may consider in weighing hostile work environment claim).

■■■■ This fundamental analysis is no different in the same-sex sexual harassment context. The Supreme Court has expressly held that "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant . . . are of the same sex." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (first alteration in original). But a male victim of same-sex sexual harassment "must show that he was harassed *because he was male.*" *Simonton v. Runyon,* 232 F.3d 33, 36 (2d Cir. 2000) (emphasis in original). Writing for a unanimous court, Justice Scalia explained this reasoning:

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, *if there were credible evidence that the harasser was homosexual.*

*Oncale,* 523 U.S. at 80, 118 S.Ct. 998 (emphasis added);[4] *see Moran v. Fashion Institute of Technology,* No. 00–CV–1275, 2002 WL 31288272, at *5 (S.D.N.Y. Oct. 7, 2002) ("In order to prevail on a same-sex sexual discrimination claim, plaintiffs must present some evidence that the harasser was homosexual."). Although the Second Circuit has not yet addressed the type of proof needed to prove a harasser is homosexual, several Circuits have offered guidance on the question. *See id.* (collecting cases). Specifically, these courts uniformly require that plaintiffs alleging same-sex sexual harassment "must either present (1) 'evidence suggesting that the harasser intended to have some kind of sexual contact with the plaintiff,' or (2) 'proof that the alleged harasser made same-sex sexual advances to others, especially to other employees.' " *Id.* (quoting *La Day v. Catalyst Tech., Inc.,* 302 F.3d 474, 480 (5th Cir.2002)).

Turning now to the facts of the case, and viewing them in the light most favorable to Plaintiff, the Court finds that Plaintiff has come forward with sufficient evidence to proceed with his hostile work environment claim.

### 1. Totality of the circumstances

■■■■ As a threshold matter, the Court must assess the alleged harassment in the context in which it occurred. *See Dawson v. County of Westchester,* 373 F.3d 265, 273 (2d Cir.2004). For example, in the prison setting, "actions of co-officers and

---

4. The Supreme Court in *Oncale* outlined three ways in which a plaintiff can show that same-sex harassment could constitute discrimination based on sex. First, a plaintiff can provide "credible evidence that the harasser was homosexual." *Oncale,* 523 U.S. at 80, 118 S.Ct. 998. Second, a plaintiff can demonstrate that the harasser was "motivated by general hostility to the presence of [members of the plaintiff's sex] in the workplace." *Id.* Third, a plaintiff may "offer direct, comparative evidence about how the alleged harasser treated members of both sexes [differently] in a mixed-sex workplace." *Id.* Though Plaintiff purports that "two of [these] three tests are supported by the facts in this case," (Opp. At 11), he makes no attempt to identify anything in the record supporting his entirely conclusory argument that "there is also substantive evidence that Messina treated men differently than women." (*Id.* at 12.) Accordingly, this Court only considers whether credible evidence exists to suggest that Messina was homosexual.

superiors that undermine an officer's sense of personal safety or compromise her capacity to command respect and obtain compliance from co-workers, subordinates, and inmates assume greater, not lesser, significance." *Id.* Here, both Plaintiff and his alleged harasser were armed security officers guarding a nuclear power plant that has been described as one of the nation's "highest consequence targets." JAMES J. FOREST, HOMELAND SECURITY: PROTECTING AMERICA'S TARGETS 163 (Praeger Security International 2006). (*See* Tepperwien Dep. Tr. 31:9–14; 237:14–18; Messina Dep. Tr. 47:18–21.) More than 20 million people live within 50 miles of Indian Point, which lies about 35 miles due north of Times Square. As in the prison context, "actions of co-officers . . . that undermine an officer's sense of personal safety," *Dawson*, 373 F.3d at 273, assume greater significance in this context. The substance of Plaintiff's allegations cannot be divorced from the nature of his duties and the highly sensitive work environment at IPEC, which must be considered in assessing Plaintiff's hostile work environment claim as a whole.

 Prior to the attack in which Messina allegedly grabbed Plaintiff's buttocks, Messina had allegedly verbally harassed Plaintiff repeatedly in a sexual manner. He allegedly asked Plaintiff questions of a sexually explicit nature, discussed his attraction to Plaintiff openly and in front of other security officers, and solicited a *quid pro quo* sexual relationship with Plaintiff. A reasonable jury could find these alleged instances of verbal harassment, if true, to be more than just "mere offensive utterance[s]," *Harris*, 510 U.S. at 23, 114 S.Ct. 367, but also degrading and humiliating, particularly in light of the other instances of alleged harassment. A reasonable jury could also conclude that such statements undermined Plaintiff's "sense of personal safety" or compromised his "capacity to command respect and ob-

tain compliance from co-workers." *Dawson*, 373 F.3d at 273.

The alleged November, 2004 attack was of a physical and threatening nature. According to Plaintiff, Messina attacked abruptly from behind while Plaintiff was on the phone with his wife. (Tepperwien Dep. Tr. 146:2.) Allegedly knowing that the attack would occur in a security camera blind spot, Messina emerged from the armory and "edged up against" Plaintiff, and, while pressing against Plaintiff from behind, drove "his nails into [Plaintiff's] buttocks." (Tepperwien Dep. Tr. 146:4–6.) Messina was a rifle instructor at the time of the first alleged attack, and Plaintiff had knowledge of—and on at least one occasion witnessed firsthand—Messina's overbearing (although not sexual) conduct towards other officers. (Tepperwien Dep. Tr. 111:19–113:5.) Plaintiff was also aware that other security officers had complained about Messina's overly aggressive behavior with no apparent consequence to Messina. (Tepperwien Dep. Tr. 141:23–142:10.) Indeed, Messina knew of, and may have been emboldened by the fact that other security officers had complained to management about his "behavior" and "shouting," particularly in connection with his duties as an instructor at the range, with no disciplinary actions brought against him. (Messina Dep. Tr. 61:10–23.)

For example, one IPEC security officer testified that Messina engaged in "screaming, belittling, yelling" on the range, and described Messina's conduct as "aberrant." (Tagley Dep. Tr. 22:12–20; 24:16–21.) Another security officer characterized Messina's "interaction at times" as "a little bit crazy," and testified that Messina occasionally "lost a little control or [ ] was a little more aggressive than you really need to be with people." (*See* Deposition of Alfred K. Hicks 82:20–83:7.) Yet another security officer testified that a remark Messina

made on the firing range about the buttocks of a security officer who was practicing on the range while firing in a prone position constituted "aberrant behavior," and further testified that he knew "two Vito Messinas." (Deposition of Stephen K. Hoffman 37:16–17; 39:14–17.) This officer found Messina's behavior particularly objectionable because it was the behavior of "an instructor at a firing range on a military site with loaded weapons." (*Id.* at 42:23–25.) Such testimony and allegations cast Messina as a potentially unstable security officer willing to flout rules of professional decorum in dangerous and sensitive environments, like the rifle range. Knowing that Messina regularly acted in such a manner, and was never disciplined for such misconduct, might well have given Plaintiff greater reason to fear additional harassment, and materially and unreasonably interfered with Plaintiff's work performance, as he sought to avoid Messina whenever possible. (Tepperwien Dep. Tr. 107:24.)

 While the second alleged incident may have been less threatening than the first, it was also physical in nature and equally unwelcome. During the second incident, Messina allegedly admired Plaintiff's hair, stroked Plaintiff's hair and neck, and told Plaintiff "You know, you want me to touch you. You want me as much as I want you. So, don't give me this you don't want to be touched.... [T]his is really cute, you're playing hard to get. I can touch you any time I want to ... and there's nothing you can do about it." (Tepperwien Dep. Tr. 190:8–16.) Defendant correctly points out that "[s]imple teasing, offhand comments, and isolated incidents will not amount to discriminatory changes in the terms and conditions of employment," (Def.'s Mem. 11), but Messina's alleged behavior went beyond "simple teasing," and a reasonable jury could find that such conduct contributed to an objectively hostile or abusive work environment.

In view of the foregoing, there is sufficient evidence on the record to create a genuine issue of material fact as to whether an objectively hostile work environment existed.

 The Court also finds that Plaintiff has come forward with sufficient evidence demonstrating that his subjective perception was that the work environment was hostile or abusive, as he complained about the alleged harassment, objected to Messina's return to work, and altered his work schedule to avoid Messina entirely. (Tepperwien Dep. Tr. 221:13–222:5.)

### 2. Credible evidence suggesting that alleged harasser is homosexual

 Plaintiff has come forward with sufficient evidence to raise a genuine issue of material fact as to whether Messina is homosexual and whether Plaintiff was harassed "because he was male." *Simonton*, 232 F.3d at 36. Although Plaintiff testified that he "didn't think Vito [Messina] was a homosexual," (Tepperwien Dep. Tr. 300:14–22), that testimony referred to his belief at the time of the 2004 incident. Plaintiff's subjective perception at that time is not dispositive, especially when the harassment continued. The question is simply whether "credible evidence" exists sufficient to raise a genuine issue as to whether Messina acted out of sexual desire in harassing Plaintiff. Such evidence can include evidence suggesting that the harasser intended to have sexual contact with the plaintiff or evidence that the alleged harasser made same-sex sexual advances to others. *See Moran*, 2002 WL 31288272, at *5. Viewing the record in the light most favorable to Plaintiff, there is evidence suggesting that Messina's alleged conduct towards Plaintiff was motivated by sexual desire. Unlike the party alleging sexual harassment in *Moran*, Plaintiff has presented more than "facts demonstrating

that [the alleged harasser] paid a lot of attention to him, stood close to him, touched his arm or shoulder for a minute or less, talked to him about co-workers, and stared at him." *Id.* The plaintiff in *Moran* merely *"felt* that [his alleged harasser's] actions toward him were sexual, and that [his alleged harasser] was therefore homosexual." *Id.* (emphasis in original). Here, in contrast, there is evidence suggesting that Messina sought to have sexual contact with Plaintiff on more than one occasion, explicitly raised the issue of homosexual relations, stated that he was aroused by Plaintiff, and expressed disappointment that Plaintiff was not aroused by him. Further, Messina is alleged to have tried to grab the crotch of another co-worker.[5]

 The Court is mindful that the line between teasing or hazing and sexual harassment is not always simple to discern. A statement can carry different meanings and connotations depending on how it was said. An otherwise innocent physical touch can, in certain contexts, be a sexually threatening touch. It is not, however, the Court's place to supplant the factfinder's role and make such determinations. Where a genuine issue of material fact exists as to whether the alleged conduct caused the workplace to be permeated with discriminatory intimidation sufficiently severe or pervasive to alter the conditions of one's work environment, and credible evidence exists to suggest the alleged harasser in a same-sex sexual harassment case may be homosexual, it is the role of the jury, not the court, to resolve such issues. In light of the forgoing, the Court finds that Plaintiff has met his burden of showing that there is a genuine issue of material fact that Messina's behavior toward him was because of his sex.

### 3. Imputing Messina's Conduct to Entergy

 The Court also finds that there exists a genuine issue of material fact as to whether a specific basis exists for imputing Messina's conduct to Entergy. As the Second Circuit has remarked, "[t]he starting point for analyzing employer vicarious liability in a Title VII hostile work environment action is to determine whether the person who allegedly created that environment is properly characterized as having been the plaintiff's 'supervisor.'" *Mack v. Otis Elevator Co.,* 326 F.3d 116, 123 (2d Cir.2003). When "behavior illegal under Title VII culminates in a supervisor's tangible employment action, the employer will, *ipso facto,* be vicariously liable for it." *Id.* at 124. When no tangible employment action is taken, however, a defense becomes available to the employer if it can show that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," *and* (b) that the plaintiff/employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 125 (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Generally, an employer is not vicariously liable for hostile work environment created by a mere co-worker of the victim. *Id.* at 123. "Where an employee is the victim of sexual harassment ... by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino,* 385 F.3d at 225.

There is a genuine issue of material fact as to whether Messina's authority over

---

**5.** O'Hara interpreted the episode (O'Hara Dep. Tr. 35:14–36:2), which Messina denied (Messina Dep. Tr. 103:15–17), as hazing (O'Hara Dep. Tr. 35:19–21).

Plaintiff, bestowed upon him by Entergy, enabled him or materially augmented his ability to impose a hostile work environment. *Mack*, 326 F.3d at 125. The parties do not dispute that Messina, although he did not have a supervisory title, was a rifle instructor for some period of time while at Entergy. Messina testified that his duties in that capacity included training officers with rifles and pistols (Messina Dep. Tr. 44:4–7), evaluating security officers on the range (Messina Dep. Tr. 33:7–34:4), directing officers who did not meet their shooting qualifications to reschedule (Messina Dep. Tr. 44:19–25), and removing individuals from the range if their weaknesses involved safety violations (Messina Dep. Tr. 45:2–6). There is no allegation, however, that Messina took tangible employment action (such as firing, failure to promote or reassignment) against Plaintiff. Accordingly—assuming Messina was a supervisor—Entergy may rely on the affirmative defense set forth in *Burlington Industries* and *Mack*, discussed above. It is not clear at this stage whether Entergy is alleging that Plaintiff failed to take advantage of employer-provided opportunities to avoid harm, nor is it clear, as discussed below, whether Entergy exercised sufficiently reasonable care to prevent and correct sexual harassment. Thus, factual issues exist if Messina is regarded as a supervisor.

Likewise, factual issues exist if Messina is not regarded as a supervisor, as Plaintiff has come forward with evidence upon which a reasonable factfinder could find that a specific basis exists for imputing Messina's conduct to Entergy even if he and Plaintiff were merely co-workers. In view of the record as a whole, there is evidence in the record from which a reasonable trier of fact could conclude that Entergy knew about the alleged harassment. Although Entergy has a clear Harassment Prevention Policy, a jury could nonetheless find that the steps taken in response to Plaintiff's complaints that Messina allegedly grabbed his buttocks, and later allegedly touched his neck and hair were insufficient. A jury could find that the company's investigation of and response to Plaintiff's first complaint against Messina was appropriate in light of Plaintiff's desire for anonymity and the he-said-he-said nature of the allegations, or it could find that the company encouraged anonymity knowing, but not explaining, that it would result in a perfunctory investigation; that more could have been done to investigate the grabbing allegation without compromising Plaintiff's anonymity; that the investigation should have also covered Messina's alleged improper sexual remarks; and/or that it should have also covered Messina's alleged attempted touching of O'Hara. The same can be said of Plaintiff's second allegation of physical harassment: although Entergy took certain steps in response to Plaintiff's allegations, including formally disciplining Messina by issuing him a written reprimand, a reasonable factfinder may nonetheless conclude that by keeping the investigation within the Security Department, treating the matter simply as one of Messina's fitness for duty, and in essence giving Messina a ten-week paid vacation but no diminution in pay or status, Entergy failed to take appropriate remedial action.

Because a question of fact exists as to whether Messina was a supervisor, and further questions of fact exist under either standard, there is a genuine issue of fact as to whether Messina's alleged conduct can be imputed to Entergy. Accordingly, and for all of the foregoing reasons, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is denied.

## C. Retaliation

Entergy also contends that there is insufficient evidence as a matter of

law to support Plaintiff's claim of retaliation. To prove his retaliation claim, Plaintiff must show that: (1) he engaged in protected activity under Title VII, (2) his employer was aware of this activity, (3) the employer took adverse action against him, and (4) there was a causal connection between the protected activity and the adverse action. *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir.2006). The first two elements are questions of law, while the third and fourth present questions of fact typically left to a jury. *See Justice v. Danberg*, 571 F.Supp.2d 602, 613 (D.Del.2008) (citing *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir.2004)). Should the plaintiff state a claim for retaliation, the defendant may proffer a non-discriminatory, legitimate reason for taking the action complained of, at which point the burden shifts back to the plaintiff to prove that the employer's reason is a pretext for the true retaliatory motive. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001); *Copeland v. Rosen*, 38 F.Supp.2d 298, 306 (S.D.N.Y.1999).

Plaintiff contends that the protected activities at issue include (1) his complaint to the NRC in the middle of January, 2006 (Pl.'s Opp. at 7; *see also* Tepperwien Dep. Tr. 242:25–243:6), and (2) his filing of a charge of employment discrimination with the EEOC in or around February or March, 2006 (Pl.'s Am. Compl. ¶ 11). Plaintiff's further argument, however, that he was "the subject of numerous fact findings, many of which were aborted and unrecorded" is simply not substantiated by the record, which contains only two instances of allegedly adverse actions. (Pl.'s Statement ¶ 122, Pl.'s Amended Compl. ¶ 32.) These two instances are (1) the issuance of a "counseling" to Plaintiff in January 2006 (Tepperwien Dep. Tr. 239:20–240:5); and (2) the questioning of

Plaintiff by counsel for Entergy regarding his complaint to the NRC on or around February 1, 2006 (Tepperwien Dep. Tr. 252:19–253:2).

It is undisputed that Plaintiff's complaints to the EEOC and NRC are protected activities. *See McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir.2001) (plaintiff need only "have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII" in order to satisfy the "protected activity" element of Title VII retaliation claim). Because Plaintiff first filed his charge of discrimination with the EEOC sometime *after* the allegedly adverse actions took place, however, his complaint to the EEOC necessarily cannot serve as the basis for either of the two allegedly retaliatory actions.[6] As a result, only the complaint to the NRC, which was made in "the middle of January, 13th, 14th, [2006] somewhere along there" (Tepperwien Dep. Tr. 243:4–5), can serve as the basis for any charge of retaliation under Title VII. As Defendant does not dispute that it was aware of Plaintiff's NRC complaint (*see* Def.'s Statement ¶ 119), all that remains for this Court to determine is whether there are genuine issues of fact as to whether Entergy took adverse action against Plaintiff and whether a causal connection existed between the protected activity and the allegedly adverse actions.

### 1. Issuance of a "Counseling" to Plaintiff

In early January 2006, after Messina had returned to work, Plaintiff was questioned by two lieutenants about his alleged failure to report missing equipment. Plaintiff explained that he was not aware that equipment was missing because his other duties had precluded him from

---

6. *See* note 3, *supra.*

"check[ing] on the equipment." (Tepperwien Dep. Tr. 235:8–13.) Approximately one week later, Plaintiff filed a complaint with the NRC about Messina's "unsafe behavior ... on the firing range" (*Id.* 246:14–15), and Messina's sexual harassment (Pl.'s Statement ¶ 119). Approximately one week after that, on or around January 21, 2006, Plaintiff was "dragged in for a counseling" regarding his failure to report the missing equipment. (Tepperwien Dep. Tr. 238:3–15.) Plaintiff alleges that he told the supervisors administering the "counseling" that he had followed procedure and could not have reported missing equipment if he did not know it was missing, and that he asked if the counseling was retaliation. He alleges that the supervisors both said that they did not see a reason for the counseling but that "upper management" had demanded it. (Tepperwien Dep. Tr. 238:3–15.) Plaintiff alleges that the issuance of a "counseling" constituted an "adverse action" within the Title VII anti-retaliation framework.

■■■ The anti-retaliation provision of Title VII is not limited to discriminatory actions that alter or "affect the terms and conditions of employment." *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Rather, "actionable retaliation" is that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S.Ct. 2405 (internal quotation marks omitted). Accordingly, "whether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination." *Zelnik v. Fashion Institute of Technology,* 464 F.3d 217, 226 (2d Cir.2006) (internal quotation marks omitted). "[W]here the employer merely enforces its preexisting disciplinary policies in a reasonable manner," its conduct will not constitute adverse employment action. *Joseph v. Leavitt,* 465 F.3d 87, 91 (2d Cir.2006).

■■■ The alleged act of retaliation here—the issuance of a counseling to Plaintiff one week after he filed his complaint with the NRC—though not severe, could be regarded as sufficient to dissuade a reasonable worker from speaking out. It was not an oral warning, and was expressly memorialized in an "Employment Discussion Guide" that was placed in Plaintiff's file. (*See* Ex. Q. to Pl.'s Opp.) The "Employee Discussion Guide" prepared in connection with the alleged infraction is "used by supervision to document disciplinary action(s) to a Security Force Member." (*Id.*) Though Defendant argues that the counseling was "not a formal discipline" (Def.'s Mem. 19), it implicitly concedes that the counseling indeed constituted a form of discipline (*Id.* at 20 (noting "Plaintiff and the other security officer who was also issued discipline ...")). Other courts have found similar forms of discipline to be sufficient to survive summary judgment on the issue of adverse employment action. *See Henton v. City of New London,* No. 06–CV–2035, 2008 WL 2185933, at *14 (D.Conn. May 23, 2008) (jury can find that two instances of discipline could dissuade reasonable employee from making charge of discrimination); *Monclova v. City of New York,* No. 05–CV–3164, 2008 WL 822117, at *7 (E.D.N.Y. March 26, 2008) (refusal to transfer plaintiffs to safer work environment and issuance of disciplinary charges constitute adverse employment actions); *Witt v. Moffe,* No. 03–CV–397A, 2008 WL 324255, at *2 (W.D.N.Y. Feb. 6, 2008) (issuance of letter of counseling and corresponding notation in plaintiff's personnel record would dissuade reasonable worker from making or supporting a charge of discrimination).

■■■ While simply enforcing a pre-existing disciplinary policy in a reasonable fashion is insufficient to constitute adverse

employment action, Plaintiff has presented sufficient evidence from which a jury might conclude that the application of the policy was not reasonable here. At least one witness backs up Plaintiff's view that he was placed in an impossible position and "set up for failure." (O'Hara Dep. Tr. 74:7–8.) Further, even the supervisors imposing the discipline did not think it was warranted, a conclusion reinforced by personnel of Entergy's Employee Concerns program, which ultimately rescinded the action.[7] While ordinarily the Court would not in this context delve into the merits of the underlying disciplinary proceeding, Plaintiff here has presented sufficient evidence that even Defendant's own first-line supervisors believed the discipline to be unreasonable and thus it can potentially be regarded as adverse employment action.

 On the issue of causation, Plaintiff need not show that a retaliatory motive was the sole cause for the allegedly adverse employment action. Rather, Plaintiff can survive summary judgment if he can show that an issue of fact exists as to whether "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir.1990) (emphasis added). The timing of the issuance of the counseling—one week after Plaintiff complained to the NRC (and two weeks after the events about which Plaintiff was counseled)—raises an inference of retaliatory motive. See Lovejoy–Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir.2001) (time span between company's receipt of EEOC complaint and suspension "is short enough to permit a jury to infer a causal connection" between protected activity and adverse employment action); Walker v. The Access Agency, No. 02–CV–199, 2004 WL 2216526, at *8 (D.Conn. Aug. 31, 2004)

("retaliatory intent can be inferred because the layoff occurred just weeks after the end of [plaintiff's] medical leave" under the Federal Family and Medical Leave Act). The inference is strengthened here by the evidence that "upper management" insisted on the counseling in circumstances where other supervisors disagreed on its propriety.

In short, Plaintiff has presented evidence sufficient to create a triable issue as to whether the counseling was retaliatory.

**2. Questioning of Plaintiff in Connection with His NRC complaint**

On or around February 1, 2006, Plaintiff met with counsel for Entergy to discuss his complaint to the NRC and Messina's "aberrant" behavior. Plaintiff alleges that he was brought to the meeting under false pretenses by Security Manager Terrence Barry, who allegedly told Tepperwien that his name had "been picked out of a hat" to speak with a company attorney about an "NRC regulatory matter." (Pl.'s Am. Compl. ¶ 33; Tepperwien Dep. Tr. 253:14–25.) When Tepperwien arrived for the meeting, he learned he would not be questioned about a standard regulatory matter, but about the circumstances surrounding the NRC's investigation, prompted by his complaint, into Messina's "aberrant" behavior. (Tepperwien Dep. Tr. 257:9–18.)

 Barry's alleged "trick[ing]" of Plaintiff cannot constitute "adverse action" within the anti-retaliation analysis. Even if Plaintiff was temporarily under the wrong impression about the nature of the meeting (a fact in dispute), no reasonable trier of fact could find that that fact, or the questioning of Plaintiff by Entergy's counsel in connection with the NRC investigation of Messina, constituted an "adverse action" for purposes of a Title VII retalia-

---

7. The rescission of the discipline does not render it harmless for the purposes of Title

VII's retaliation provision. See Burlington Northern, 548 U.S. at 72, 126 S.Ct. 2405.

tion claim. *See Burlington Northern,* 548 U.S. at 68, 126 S.Ct. 2405. The meeting had nothing to do with Tepperwien's performance, his job duties, or his work relationships. It neither affected nor altered Plaintiff's employment, standing or career. Indeed, far from having the effect of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination," *id.* at 68, 126 S.Ct. 2405, the meeting would suggest to a reasonable worker that Entergy was taking seriously Plaintiff's complaint to the NRC, as well as the investigation into Messina's behavior. Even if Entergy was not entirely forthright in bringing Plaintiff to the meeting, that, alone, cannot render an otherwise non-retaliatory action retaliatory in nature.

■ Further, assuming that Plaintiff could establish a *prima facie* claim of retaliation on this basis, the meeting with Entergy's counsel had a legitimate non-retaliatory reason. *See Holtz,* 258 F.3d at 81 (once *prima facie* case of retaliation is established, burden shifts to employer "to articulate a legitimate, non-discriminatory reason for the allegedly retaliatory act.") Entergy was entitled to look into the safety concerns Plaintiff had brought to the NRC's attention in mid-January. (*See* Tepperwien Dep. Tr. 263:7–14 (Entergy counsel interested in conduct at rifle range, not sexual harassment allegations).)

Plaintiff has not come forward with any evidence to suggest that the meeting with Entergy's attorney was a pretext for unlawful discrimination or retaliation. *See Cifra,* 252 F.3d at 216 (when plaintiff has adduced evidence sufficient to constitute *prima facie* case and employer has articulated legitimate non-retaliatory reason for alleged adverse action, plaintiff must point to evidence sufficient to permit rational factfinder to conclude that employer's explanation is pretext for impermissible retaliation); *see also Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996)

(pretext cannot be established by plaintiff's "personal belief," especially where "the facts ... indicate" that defendant was not motivated by unlawful animus).

Weighing all the facts on the record that support Plaintiff's allegations and indulging all reasonable inferences in his favor, the Court concludes that a reasonable jury could not find that the questioning by Entergy's counsel in connection with the NRC investigation constituted retaliation. Even assuming Plaintiff could establish a *prima facie* case that the questioning constituted adverse action under Title VII, the meeting had a clear non-retaliatory purpose in nature, and Plaintiff has identified nothing on the record to suggest the meeting was a pretext for unlawful retaliation. Accordingly, partial summary judgment is granted to Defendant with respect to Plaintiff's allegation that the NRC meeting constituted retaliation.

### D. Constructive discharge

■ Defendant also moves for summary judgment on Plaintiff's constructive discharge claim, arguing that Plaintiff has not made out a *prima facie* case. An employee is constructively discharged when his employer intentionally creates a work atmosphere so intolerable that he is forced to resign involuntarily. *Petrosino v. Bell Atlantic,* 385 F.3d 210, 229 (2d Cir. 2004); *see Terry v. Ashcroft,* 336 F.3d 128, 151–52 (2d Cir.2003). The test for constructive discharge is a purely objective one that looks to the employer's intentional conduct in creating intolerable work conditions. *See Petrosino,* 385 F.3d at 230 ("[W]hether the employer's deliberate actions rendered the employee's work conditions so intolerable as to compel resignation ... is assessed objectively by reference to a reasonable person in the employee's position.").

■ Even accepting all of the non-movant's factual allegations as true, Plain-

tiff has not made out a claim of constructive discharge because his working conditions at the time of resignation were not "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir.2000) (internal quotation marks and alteration omitted). In arguing to the contrary, Plaintiff offers only conclusory assertions that he felt marginalized, unsafe, and stressed. These generalities are no substitute for concrete evidence of working conditions that are objectively intolerable. Indeed, Plaintiff points to no changes in his working conditions except a transfer to a night shift, suggested by a supervisor to avoid even the possibility of contact with Messina. (Tepperwien Dep. Tr. 220:2–17.) Plaintiff admittedly accepted the suggestion (Tepperwien Dep. Tr. 221:4–5); it was not forced on him. Earlier, Messina had been placed on a different shift than Plaintiff. (Tepperwien Dep. Tr. 216:18–217:2.) Entergy's accommodations, far from exhibiting the "intolerable" working conditions necessary to sustain a constructive discharge claim, demonstrate a degree of flexibility in accommodating Plaintiff's concerns. It is thus unsurprising that Plaintiff remained at Entergy for more than a year after the second alleged incident of harassment. Had the "working environment become so intolerable that . . . resignation was a fitting response," *Pa. State Police v. Suders*, 542 U.S. 129, 134, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), Plaintiff would not have waited so long to take that action.

 Moreover, that Plaintiff apparently began searching for another job while he remained employed with Entergy militates against his constructive discharge claim. *See Regis v. Metro. Jewish Geriatric Ctr*, No. 97–CV–0906, 2000 WL 264336, at *12 (E.D.N.Y. Jan. 11, 2000) ("An em-

ployee who remains on the job while looking for alternative employment is hard-pressed to establish that her working conditions were intolerable.") Tepperwien tendered his resignation on September 3, 2006, providing Entergy with two weeks notice, and exactly two weeks later filled out a Form W4 with his new employer. (Tepperwien Dep. Tr. 28:11–29:14.)

Defendant emphasizes that Plaintiff, upon his departure, filled out a "Separating Employee Survey" in which he indicated satisfaction with his work conditions, did not mention harassment or retaliation, and indicated that he was leaving because he desired a more flexible work schedule. (Def.'s Statement ¶ 63; Pl.'s Statement ¶ 63.) While this evidence speaks to Plaintiff's own experience, rather than to the objective views of a reasonable person in Plaintiff's circumstances, it likewise suggests that those circumstances were not in fact intolerable.

In sum, viewing the record in the light most favorable to Plaintiff, he has failed to come forward with concrete evidence that the work atmosphere at Entergy was so objectively intolerable that he was forced to resign involuntarily. Accordingly, he has failed to make out a *prima facie* case of constructive discharge, and summary judgment must be granted to Defendant on this claim.

### III. *Conclusion*

It is hereby ORDERED that DEFENDANT's Motion is GRANTED IN PART and DENIED IN PART. The Clerk of Court is respectfully directed to terminate the pending motion. (Doc. 41.) The parties are directed to appear for a status conference on April 8, 2009 at 10:00 a.m. **SO ORDERED.**