10-1425-cv
Tepperwien v. Entergy Nuclear Operations

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2010

(Argued: March 18, 2011                    Decided: October 31, 2011)

Docket No. 10-1425-cv

—————————

JAMES TEPPERWIEN,

*Plaintiff-Appellant*,

v.

ENTERGY NUCLEAR OPERATIONS, INC.,

*Defendant-Appellee*.[*]

—————————

Before:

KATZMANN and CHIN, *Circuit Judges*,
and GLEESON, *District Judge*.[**]

—————————

Appeal from a final judgment of the United States District Court for the Southern District of New York (Seibel, *J.*) dismissing plaintiff-appellant's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

AFFIRMED.

Judge Gleeson dissents by separate opinion.

———————————————

[*]     The Clerk of the Court is directed to amend the official caption in accordance with the above.

[**]     The Honorable John Gleeson, United States District Judge for the Eastern District of New York, sitting by designation.

RAYMOND KUNTZ (Neil VanderWoude, *on the brief*), Gerosa & VanderWoude, Carmel, New York, *for Plaintiff-Appellant*.

CATHERINE M. MASTERS (Elisabeth Carey-Davis, *on the brief*), Schiff Hardin LLP, Chicago, Illinois, *for Defendant-Appellee*.

CHIN, *Circuit Judge*

In this case, plaintiff-appellant James Tepperwien was employed as a security officer by defendant-appellee Entergy Nuclear Operations, Inc. ("Entergy") at the Indian Point Energy Center ("Indian Point") in Buchanan, New York. Tepperwien contends that he was sexually harassed by a co-worker, and brought this action below asserting claims for constructive discharge, hostile environment sexual harassment, and retaliation, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

On Entergy's motion for summary judgment, the district court dismissed Tepperwien's constructive discharge claim, but denied the motion as to his hostile environment and retaliation claims. At trial, the jury found for Entergy on the hostile environment claim and for Tepperwien on the retaliation claim. It awarded Tepperwien zero dollars in compensatory and nominal damages and $500,000 in

punitive damages.  On Entergy's post-trial motions, pursuant to Fed. R. Civ. P. 50, the district court granted judgment as a matter of law dismissing the retaliation claim.  Ruling in the alternative, it vacated the punitive damages award on the grounds the evidence did not support an inference of malice or reckless indifference on the part of Entergy. Finally, the district court held that if Entergy were not entitled to judgment as a matter of law on the retaliation claim, it would grant a new trial pursuant to Rule 59.

Tepperwien appeals from the district court's rulings.  We affirm.

*STATEMENT OF THE CASE*

A.   *The Facts*[1]

1.   *Tepperwien's Employment with Entergy*

At all relevant times, Entergy owned and operated two nuclear power plants at Indian Point.  Tepperwien first began working at Indian Point as a security officer for Wackenhut Services, Inc., an independent security company, in February 2002.  After Entergy took over the operations,

---

[1]   The facts are drawn primarily from the trial record. "When an appeal comes to us after a jury verdict, we view the facts of the case in the light most favorable to the prevailing party." *See Kosmynka v. Polaris Indus.*, 462 F.3d 74, 77 (2d Cir. 2006).  Here, although Entergy was the prevailing party with respect to the hostile environment claim and the claim for compensatory damages for retaliation, as a matter of convenience, we view all the evidence in the light most favorable to Tepperwien.

Tepperwien was integrated into the Entergy security force in March 2003.  He resigned from Entergy in September 2006.

2.  *The Verbal Harassment*

Tepperwien was required, as part of his employment as a security officer, to receive training and to re-qualify annually in the use of firearms.  In the spring or summer of 2003, Tepperwien started receiving firearms training from Vito Messina, another Entergy security officer.  When Messina was instructing at the firearms range, he was acting as a manager or supervisor.  He had the ability to disqualify other officers from using and carrying firearms, and an officer who did not re-qualify was not able to perform many of the functions of a security officer.

Over the course of a one-year period beginning in the summer of 2003, Messina verbally harassed Tepperwien four times.  First, in front of other security officers, Messina asked Tepperwien:  "Do you think you would ever have sex with a man?  Do you think it's all right?"  Tepperwien responded that he could not "explain people" and walked away.  Second, the next time Tepperwien went to the range, Messina said to him privately:  "I think you and I could be very good friends, very good friends, and we could see each other.  And I could take good care of you.  And I could even get you [] good jobs . . . at the plant."  Tepperwien

politely left.  Third, the next time Tepperwien was at the range, Messina said to him:  "[W]hy don't I excite you?  Don't you -- don't you get excited about me?"  Tepperwien responded by saying "I'm ready to shoot," and proceeded with the drill.  Finally, the last time Tepperwien was at the range with Messina, Messina said to a group of twelve officers in Tepperwien's presence:  "[C]ome on, let's get going, let's get shooting.  Jim Tepperwien is turning me on."

3.  *The Buttocks-Grabbing Incident*

On November 16, 2004, Tepperwien was in the command post.  He was on the telephone with his wife, telling her he was coming home early, when, as he described it, "Messina came out of the armory, shoved against me, put his nails into my buttocks, and then quickly left, bolted away."  Tepperwien tried to stop Messina from leaving, but failed.

Tepperwien reported the incident to his union representative, who in turn reported the incident to an Entergy human resources ("HR") manager.[2]  The HR manager

_____

[2]  Entergy had a harassment prevention policy that prohibited harassment in the workplace and required all employees to report any instances of harassment.  Pursuant to the policy, all Entergy employees, including managers, received training regarding the harassment prevention policy.  Employees could report violations to:  (1) a supervisor or manager; (2) HR; (3) the Employee Concerns office; (4) the on-line reporting system;

assigned a senior HR representative, Grace Sanseverino, to investigate. Sanseverino interviewed Tepperwien, Messina, and five others -- the Security Superintendent (Terrence Barry, the head of the security department) and four other security officers. Tepperwien told Sanseverino that he was reluctant to report the incident, and she suggested that he do so anonymously. Tepperwien agreed. As a consequence, although she spoke to Messina, she did not confront him directly about Tepperwien's accusation. She did ask him whether he had ever been involved with touching another person, without indicating male or female, in any inappropriate manner or place. Messina said he had not. Sanseverino also spoke to all security department employees on duty during the shift that day, and no employee reported having witnessed any inappropriate touching or grabbing.

Tepperwien's complaint against Messina was not sustained, but Barry and HR nonetheless took certain actions. First, all security officers (including Messina) were required to read and sign a memorandum setting forth Entergy's policy against discrimination, harassment, and retaliation. Second, all 180 security officers were required to attend an all-day training session on diversity,

_____

(5) the ethics hotline; and (6) the union (for bargaining-unit employees).

inclusion, and behavior at work.  Third, Messina was removed from his position (which had been temporary) as an instructor at the firing range, although this was at least in part a consequence of whether Messina was in the position in violation of union bargaining unit rules.

In December 2004, a few weeks after Tepperwien had complained about the buttocks-grabbing incident, a fact-finding investigation ("fact-finder") was opened into his use of sick time.[3]  He had been out of work for approximately a month apparently as a result of an injury.

---

[3]     At trial, Tepperwien described his understanding of a "fact-finder" at Entergy:

> A fact-finding is a document.  You usually go to a fact-finding with management and with your union rep.  And the fact-finder is pretty much:  Did something happen?  Was it good?  Was it bad?  Can we  . . . find out if we should be doing something differently?  Shall we correct the situation or policy?
>
> Under most situations, fact-finders are there to be helpful, get everybody in a room and see if some other action has to proceed after that.

Patrick O'Hara, the chief shop steward of Tepperwien's union, who was called as a witness by Tepperwien, explained that "when things happen, the company conducts a fact finding.  There's a union representative there.  There's a management representative there.  They ask questions."  A fact-finder is a process by which "the company investigates various issues."  O'Hara would review "about 30 fact findings . . . a week."  Fact-finders are not disciplinary in nature and cannot be grieved by the union, and they do not fall within Entergy's four levels of discipline (verbal warning, written reprimand, suspension, and termination).  Depending on the findings, a fact-finder could lead to disciplinary action.

He used all his remaining sick days and vacation days. About two weeks after he sustained the injury, Tepperwien called the Entergy medical department and stated that he had sustained the injury while participating in a hand-cuffing exercise at work. He had not, however, earlier filled out an accident or incident report and hence Entergy refused to consider this a work-related injury. Entergy conducted a fact-finder into why Tepperwien had used up all his sick time. He was interviewed, and at the conclusion of the investigation, he was issued a letter advising that he would be subject to disciplinary action if he abused his sick time leave in the future.

    4.    *The Hair-Touching Incident*

        When Tepperwien returned to work, he was able to avoid working with Messina for some months. On August 29, 2005, however, he was assigned to drive Messina to a post, where he would stay and Messina would take over the vehicle. During the ride, they were engaging in "cordial conversation" when, as Tepperwien described it:

> Vito started telling me that he found
> things about me attractive, a number of
> things; the way I looked, the way I
> presented myself. And in particular, he
> liked my hair style. And we're driving
> up to the post. And the next thing I
> knew, he had his hands on my shoulder and
> going up my neck and into the back of my
> head.

Tepperwien told Messina not to touch him, and Messina responded "I'm going to touch you as much as I want." They arrived at their destination and parted.

The next day, Tepperwien reported the incident to the site security superintendent, John Cherubini. Cherubini confronted Messina, and Messina admitted touching Tepperwien's hair, although he contended he was just removing something from Tepperwien's hair. Messina also admitted telling Tepperwien he had "nice hair." Later that day, Messina "was walked off post." He was put on paid administrative leave pending investigation and was referred (by Barry) for a mandatory psychological evaluation to ensure his fitness for duty.

Messina returned to work on November 9, 2005, after he was found fit for duty. He was issued a "Letter of Discipline," signed by Barry; this was a written reprimand to be placed in Messina's personnel file. The letter advised Messina that Entergy expected him to "refrain from *any* type of inappropriate behavior and conduct in the workplace." It advised him that "[f]ailure to comply with the terms of this reprimand will result in your termination of employment as an Entergy Nuclear Security Officer."[4]

_____

[4] O'Hara, the chief shop steward, testified that if Entergy had sought to terminate Messina'a employment on November 9, 2005, the union "clearly" would have filed a grievance because

In November 2005, shortly after Messina returned to work from his administrative leave, Tepperwein met with Barry, a site security supervisor, and union representatives. Barry told Tepperwien that he had wanted to fire Messina, but after consulting with others, he decided to impose a ten-week suspension instead. At one point, Tepperwien said to Barry, facetiously, "Terrence, what are you going to do now? Give me a letter that says I can protect myself? That I can -- I can kick Vito in the groin if he comes after me?" Barry responded, "[N]o, no, no. If Vito ever touches you again or anybody ever touches you again, I want you to secure your post and go and tell management and report it." He added that he thought Tepperwien was being "overemotional" and said "I don't think I'm going to let you back on site." Tepperwien responded by denying he was being overemotional and stated that he had every intention of going back on site.

5. *Entergy's Additional Actions With Respect to Tepperwien*

On January 7, 2006, Tepperwien was the subject of another fact-finder. A gas mask was discovered missing from

---

"the only thing that we . . . knew for sure was that Mr. Messina had touched Mr. Tepperwien's hair . . . . [I]f the company was going to terminate Mr. Messina for touching another employee's hair, surely an arbitrator would overturn that. We were very confident. And I think the company knew that."

a building on Tepperwien's security route.  A fact-finder was conducted to find out why Tepperwien had not reported the mask missing.  Tepperwien acknowledged that he had not checked all his assigned equipment when he took over the post, but he explained that it was physically impossible for him to check his equipment at that post, as the equipment was not stored there.

Approximately two weeks later, a counseling letter was issued to Tepperwien confirming that he had been counseled to check and inspect assigned equipment when assuming a post.  Another security officer, who held the post the shift before Tepperwien took over, was similarly given a fact-finder and counseling letter for failing to inspect the contingency equipment and failing to notice a gas mask was missing.  The other officer accepted his fact-finding and counseling.  As discussed below, Tepperwien objected, and his counseling letter was later rescinded.

In late January of 2006, Tepperwien filed a complaint with the Nuclear Regulatory Commission (the "NRC") regarding the alleged sexual harassment and inappropriate sexual behavior at the Indian Point firing range.  On February 2, 2006, Barry asked Tepperwien to attend a meeting on "an NRC regulatory matter for Entergy."  Barry told Tepperwien that his "name had been picked out of a hat," and

even though it was Tepperwien's day off, he pressed Tepperwien to come in for the meeting.

In fact, the meeting was about the complaint that Tepperwien had filed with the NRC, and Entergy's outside counsel attended. Tepperwien asked if he could tape-record the meeting. He was told by one of the lawyers no. Tepperwien asked again and was told no again, this time by a supervising attorney, Darryl Shapiro. Tepperwien asked a third time about recording the meeting, and this time Shapiro responded: "We don't have a tape recorder. . . . If you continue this line, we will request -- since you're not cooperating, we will request that the company immediately terminate you." Tepperwien asked if he could call his lawyer. He was allowed to do so, and a paralegal from his lawyer's office was permitted to participate in the meeting by telephone.

In January or February 2006, when Tepperwien was on duty at approximately 7 a.m., another officer came in, about an hour and a half late. Tepperwien stopped him because "there was a tremendous odor coming off of him." The officer left, returning half an hour later. Tepperwien let him in, and reported to a supervisor a few minutes later that the officer had come in late "reeking." Tepperwien also told the officer: "I don't want to get the guy in

trouble.  He seemed fine.  He didn't slur his words, didn't trip over his feet."  The officer was later sent home as being unfit for duty.  Two other supervisors initiated a fact-finder the same day and asked Tepperwien why he admitted a "drunk" officer into the work site.  Tepperwien responded that "[n]obody said he was drunk" and advised that he had submitted an incident report.  As Tepperwien described it, the fact-finder "pretty much" ended "right then and there."

In mid-February 2006, Tepperwien met with Barbara Taggart, the coordinator of Entergy's Employee Concerns Program ("ECP") at Indian Point, to raise certain concerns. She instructed him to put his concerns in writing, and he did so, on or about February 13, 2006.  Tepperwien complained about a number of matters.  He complained about the gas mask fact-finder, explaining that he could not have possibly discovered and reported the missing mask upon assuming his post.  He complained about the counseling session and counseling letter.  He asserted that morale in the security department was "extremely low."  He complained about his meeting with Barry, and how Barry told him his name had been pulled from a hat.  He expressed concern about retaliation from management.  Although he did not include the matter in his memorandum, Tepperwien told Taggart when he met with her of Messina's sexual behavior.

-13-

On March 6, 2006, Taggart responded to Tepperwien. As for the sexual harassment, Taggart noted that the matter had been investigated and corrective actions taken, including moving the other officer (Messina) off Tepperwien's shift. As for the actions relating to the missing gas mask, Taggart noted that the counseling session provided to Tepperwien was appropriate at the time based on the known information, as management understood that Tepperwien had not checked his equipment. Based on additional information, however, Taggart noted that management had revisited the issue and was rescinding the counseling letter. As for the meeting with Barry, Taggart acknowledged that the notification for the meeting "was not handled as well as it could have been," and that action had been taken to address the issue and prevent recurrence.

Tepperwien thereafter completed an ECP "Customer Satisfaction Survey," and he noted that overall he was "satisfied" with his interactions with ECP and he was "satisfied" with the response to his concerns.

In March 2006, there was an "outage" at Indian Point, during which the reactors were shut down for repair. During outages, additional security is required and consequently shifts are combined. Tepperwien was scheduled to work with Messina the first two days. He complained both

-14-

days and was switched to another assignment both days.  On the third day, Tepperwien spoke to his union representative, who suggested that Tepperwien switch to the night shift.  Tepperwien discussed it with his wife.  He agreed, in part because he would have every weekend off.  He asked to be and was moved to the night shift.  After the outage was completed, he "decided to stay on nights a little bit longer."

Just prior to the outage, Barry conducted a meeting of the "day crew" of the security force as well as several managers.  Another security officer asked a question about staffing at a particular gate, and Barry "exploded" and yelled at the officer that he should not be asking such questions.  At some point Barry addressed the issue of conflicts, saying:  "[T]here are people . . . that don't like each other."  He said:  "There are people here I don't like," and stared at Tepperwien.

In July or August 2006, Tepperwien was stationed in a "bullet-resistant enclosure" ("BRE").  Once a security officer was inside a BRE, he was not supposed to leave until he was relieved by another officer.  At approximately 4 a.m., Tepperwien received a telephone call from a lieutenant who asked Tepperwien to watch a truck that was parked in the yard.  The truck was partially in Tepperwien's view, and he

watched it from inside the BRE for about two hours before being relieved by another officer.  He told the relief officer of the lieutenant's order, and suggested that the relief officer call his supervisor to get instructions on whether to continue watching the truck.

A week later, Tepperwien was asked if he had passed on the orders to the officer who relieved him and Tepperwien responded yes.  A week after that, Tepperwien was "pulled in for a fact-finder" and asked about the assignment to watch the truck.  In particular, he was asked whether he had taken "escort duty" -- physical charge -- of the truck. The fact-finder ended, and Tepperwien never received a counseling letter with respect to this incident.

6.   *Tepperwien Resigns*

After the last fact-finder, Tepperwien decided that he no longer wished to be employed at Entergy.  He decided to go back to his "old profession" -- x-ray technology -- and determined that if he found another job, or even "a promise of one," he would resign from Entergy. On September 3, 2006, he submitted a letter resigning effective two weeks later.  Two weeks later he filled out a Form W4 with his new employer.

Before leaving Entergy, Tepperwien filled out a "Separating Employee Survey," in which he stated that he was

leaving for better working conditions, better or more flexible work hours, and personal considerations. He also "agree[d]" that he would consider working for Entergy again and that he had a good working relationship with his supervisor. He "strongly disagree[d]" that his work environment had an atmosphere of teamwork and cooperation. He "agree[d]" that "[o]verall, I was satisfied with my job."

B. *Prior Proceedings*

In March 2006, Tepperwien filed a charge of sexual harassment and retaliation against Entergy with the Equal Employment Opportunity Commission (the "EEOC"). Tepperwien received a right to sue letter from the EEOC on October 24, 2006.

Tepperwien commenced this action below on January 19, 2007. Tepperwien initially sued additional defendants, including his union and Messina, and asserted claims under federal and state law, but in orders entered June 18, 2007 and July 12, 2007, the district court (Brieant, J.) dismissed all claims except the Title VII claims against Entergy. Tepperwien has not appealed from these orders.

Following discovery, Entergy moved for summary judgment. On March 27, 2009, in a thorough, 30-page decision, the district court (Seibel, *J.*) granted the motion in part and denied the motion in part. *Tepperwien v.*

*Entergy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427 (S.D.N.Y. 2009). The district court denied the motion as to Tepperwien's hostile environment and retaliation claims, but granted the motion dismissing his constructive discharge claim. Tepperwien moved for reconsideration of the dismissal of the constructive discharge claim, and the district court denied the motion. *Tepperwien v. Entergy Nuclear Operations, Inc.*, No. 07 CV-433 (CS) (S.D.N.Y. Mar. 27, 2009), ECF No. 62.

The case was tried to a jury beginning on July 13, 2009. The jury returned its verdict on July 21, 2009, finding for Entergy on the sexual harassment claim and for Tepperwien on the retaliation claim, and awarding, with respect to retaliation, zero in damages for pain and suffering, $500,000 in punitive damages, and zero in nominal damages.

Entergy moved pursuant to Fed. R. Civ. P. 50 or, alternatively, for a new trial pursuant to Rule 59 or a remittitur with respect to damages. Tepperwien cross-moved for a new trial on his hostile environment claim and to reinstate the constructive discharge claim, which had been dismissed on summary judgment. He separately moved for attorneys' fees. On March 16, 2010, in a thorough and carefully considered memorandum decision and order, the

district court (Seibel, *J.*) granted Entergy's motion for judgment as a matter of law as to the retaliation claim and, in the alternative, granted Entergy a new trial on retaliation and vacated the punitive damages award.[5] *Tepperwien v. Entergy Nuclear Operations, Inc.*, No. 07 CV-433 (CS), slip op. at 18 (S.D.N.Y. Mar. 16, 2010), ECF No. 124.  The district court granted Entergy's request to strike Tepperiwen's cross-motion and denied his fee application as moot.  *Id.* at 29.  Judgment was entered accordingly, and this appeal followed.

*DISCUSSION*

On appeal, we review *de novo* a district court's grant of a motion for summary judgment pursuant to Rule 56 or a motion for judgment as a matter of law pursuant to Rule 50, applying the same standards applied by the district court.  *See Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004) (Rule 50)*; Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2002) (Rule 56).  Summary judgment may be granted only if "there is no genuine

---

[5]      We note that during trial the district court expressed some reluctance as to whether it should submit the punitive damages claim to the jury, stating:  "On the one hand, I don't see how a jury could possibly come back with punitive damages in this case, and that probably means I shouldn't let it go to them."  In the end, the district court took the more cautious approach, submitting the claim to the jury, but noting that she would revisit the issue if the jury were to award punitive damages.

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment as a matter of law may be entered against a party only if "a reasonable jury would not have a legally sufficient basis to find for [a] party on that issue." Fed. R. Civ. P. 50(a). A Rule 50 motion "'may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (quoting *Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997) (alterations in original)).

This appeal presents two principal issues: (1) whether the district court erred in granting judgment as a matter of law dismissing the retaliation claim; and (2) whether, alternatively, the district court erred in vacating the punitive damages award with respect to the retaliation claim. We address the two issues in turn.

A. *Retaliation*

Title VII contains an antiretaliation provision, which makes it unlawful for an employer to discriminate against an employee for opposing any practice made unlawful

-20-

by Title VII. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-60 (2006); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see* 42 U.S.C. § 2000e-3(a). The provision seeks to further Title VII's goal of a workplace free from discrimination on the basis of race, ethnicity, religion, or gender "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII]'s basic guarantees." *Burlington*, 548 U.S. at 63. Title VII thus prohibits an employer from taking "materially adverse" action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity. *Id.* at 56, 59; *see also Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011) ("Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct.").[6]

---

[6] Retaliation claims under Title VII are generally analyzed under a modified version of the *McDonnell Douglas* test. First, the plaintiff must establish a prima facie case of retaliation by showing: (1) his participation in protected activity; (2) defendant's knowledge thereof; (3) materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Second, if the plaintiff meets this burden, the defendant employer must then articulate a legitimate, non-discriminatory reason for its adverse employment action. Third, if the employer does so, then the burden shifts back to the plaintiff to prove that retaliation was a substantial reason for the adverse action. *Hicks*, 593 F.3d at 164-65 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). We need not engage in the full analysis here, as we focus on the third element.

Here, the principal question presented is whether the purportedly retaliatory actions taken by Entergy against Tepperwien were "materially adverse."  The district court granted judgment as a matter of law in favor of Entergy on the basis that the actions were not, as a matter of law, materially adverse.

In *Burlington*, the Supreme Court explained that Title VII's antiretaliation provision covers only an employer's actions that are "materially adverse":

> The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . .  In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Burlington*, 548 U.S. at 67-68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  Actions that are "trivial harms" -- *i.e.*, "those petty slights or minor annoyances that often take place at work and that all employees experience" -- are not materially adverse. *Burlington*, 548 U.S. at 68; *accord Hicks*, 593 F.3d at 165. As the Court reminded us in *Burlington*, Title VII does not set forth "'a general civility code for the American workplace.'"  548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

-22-

Material adversity is to be determined objectively, based on the reactions of a reasonable employee. *Id.* at 69-70. "Context matters," as some actions may take on more or less significance depending on the context. *Id.* at 69. Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct. *Hicks*, 593 F.3d at 165.

In his brief on appeal, Tepperwien contends that he was subject to at least nine acts of retaliation by Entergy: (1) three fact-finding sessions; (2) a counseling; (3) Barry's threat of termination; (4) Shapiro's threat of termination; (5) Barry's comments and stare during the employee meeting; (6) Barry's falsifying of the reason for bringing Tepperwien in on his day off; and (7) being forced to switch from a day shift to the night shift. We agree with the district court that no reasonable jury could have found that these actions, taken as described by Tepperwien and considered both individually and in the aggregate, were materially adverse.

1. *The Fact-Finders*

Tepperwien contends that three fact-finders were retaliatory: (a) January 2006, regarding the missing gas mask; (b) January or February of 2006, regarding

-23-

Tepperwien's letting an apparently drunk security officer onto the work site; and (c) July or August 2006, regarding Tepperwien's carrying out of orders to watch a truck while he was in the BRE.[7]  The district court correctly held that the three fact-finders were not materially adverse as a matter of law.

First, fact-finders at Entergy were not disciplinary in nature.  They fell outside of Entergy's four levels of discipline and could not be grieved by the union. They were common occurrences at Entergy, as the shop steward testified that he reviewed thirty fact-finders a week.  They were triggered when there was a reason to investigate, *e.g.*, to determine whether corrective action should be taken. Indeed, Tepperwien acknowledged that in "most situations, fact-finders are there to be helpful, get everybody in a room and see if some other action has to proceed after that."

Second, there was good reason for Entergy to initiate these fact-finders, and thus no reasonable employee would have found them to be materially adverse or stigmatizing.  In the first, a gas mask was discovered

---

[7]    The record contains evidence relating to a fourth fact-finder:  the December 2004 fact-finder relating to Tepperwien's use of sick leave.  On appeal, Tepperwien complains only of three fact-finders, although he does not specify which ones.  At trial, however, he did not argue that this earlier fact-finder was retaliatory in nature.

missing on Tepperwien's assigned route; another security officer was subjected to a fact-finder for the missing gas mask as well. In the second, Tepperwien permitted a security officer to pass through a security checkpoint and enter the work place; the officer was apparently intoxicated and was later sent home as unfit for duty. In the third, while Tepperwien was on watch, an unidentified truck was permitted to remain in the yard -- outside a nuclear power plant -- for at least two hours. Even assuming Tepperwien acted perfectly appropriately in all three incidents, there certainly was good reason for Entergy management to at least look into these situations.

Third, while fact-finders certainly could lead to disciplinary action, they did not here. Although a counseling letter was issued with respect to the gas mask incident, it was later rescinded. In fact, Tepperwien never complained to the ECP or his union about the fact-finders because, as he acknowledged, "[t]here was no reason to, because they all died. They didn't go anywhere." (Tr. at 224-25). He admitted that none of the fact-finders resulted in any discipline.

Finally, Tepperwien argues that he had not been subject to a fact-finding for the three years prior to his filing of his various complaints. The testimony cited for

this proposition, however, is equivocal,[8] but even assuming that Tepperwien was not subjected to any fact-finders until after he complained of sexual harassment, this is proof only of causation and a retaliatory motive -- not of materiality. Again, Title VII does not protect an employee from "all retaliation," but only "retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67; *see Hicks*, 593 F.3d at 164-65. Even assuming they were causally connected to Tepperwien's protected activity, the three fact-finders -- occurring over the course of approximately eight months, consisting only of brief inquiries, and resulting in no discipline -- were merely "trivial harms" or "petty slights or minor annoyances." *Burlington*, 548 U.S. at 68.

2.  *The Counseling*

Tepperwien argues that the counseling he received with respect to the missing gas mask was a material adverse action. We agree with the district court that it was not as a matter of law.

First, the counseling was rescinded after Tepperwien contacted the ECP. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (holding that change in employee's reporting structure was

---

[8]     Tepperwien testified that "[t]he only other fact-finders I can tell you about had to do with letters that I received stating that I had violated or had abused company sick time policy. That's all I can remember." His counsel then immediately tried to refresh his recollection about other apparent fact-finders.

not adverse employment action where it was rescinded with an apology day after employee complained); *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (holding that jury could reasonably find that negative performance evaluation did not constitute material adverse action, where it was rescinded and destroyed two weeks after it was issued); *cf. Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120-21 (7th Cir. 2009) (holding that no adverse action occurred where plaintiff never served suspension). While we do not hold that rescinded discipline can *never* constitute materially adverse action, we do hold that in the circumstances here, the rescinded counseling letter was not a material adverse employment action.

Second, as Tepperwien acknowledged, the counseling did not place him in an active disciplinary process. The form itself is titled "Employee Discussion Guide," and it confirmed that Tepperwien was not in an active "stepwise" disciplinary process. It noted only that the discussion was intended to be a "counseling" rather than a suspension, verbal warning, letter of reprimand, or "other" discipline. Hence, the form itself makes clear that a counseling is below even a warning or reprimand. The counseling was merely a discussion of a legitimate safety concern -- a missing piece of safety equipment and Tepperwien's actions in connection therewith.

-27-

Third, even assuming the counseling rose to the level of some form of criticism, we have held, in the context of the issuance of a "counseling memo," that "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).[9]

Finally, the lack of material adversity is also demonstrated by the fact that Tepperwien was not the only officer to be counseled for this issue. Another security officer was counseled for the same failure to check the equipment, and the shop steward testified that this "was an issue that had come up before, not just with Mr. Tepperwien," and the problem was "a system error, not a behavior issue." The focus here clearly was not on Tepperwien, and it was not likely that counseling of this nature, which was given to other employees as well, would deter a reasonable employee from complaining of discrimination.

---

[9]    *Accord Perez v. N.Y. & Presbyterian Hosp.*, No. 05 Civ. 5749 (LBS), 2009 WL 3634038, at *15 (S.D.N.Y. Nov. 3, 2009) (holding that disciplinary reprimand that did not alter job responsibilities or otherwise affect employment was not sufficiently *material to constitute adverse employment action); Potenza v. W. Irondequoit Cent. Sch. Dist.*, No. 06-CV-6407, 2009 WL 2876204, at *8 (W.D.N.Y. Sept. 2, 2009) (where job counseling did not result in any diminution of pay, status, or benefits, it was not adverse employment action).

In light of all the circumstances, we agree with the district court that no reasonable factfinder could have concluded that the withdrawn counseling was "the sort of action that would have dissuaded a reasonable employee in [Tepperwien's] position from complaining of unlawful discrimination."[10]

3.   *The Remaining Actions*

The remaining actions of which Tepperwien complains fall into the category of "trivial harms" and "petty slights or minor annoyances."  Barry's purported threat to walk Tepperwien off site was made after Tepperwien facetiously asked whether he could "kick Vito in the groin." The "threat," which was made in the course of a heated conversation, was never carried out.  Shapiro's purported "threat of termination" was made after Tepperwien asked not once, not twice, but three times to tape record the meeting. This "threat" likewise was never carried out, and Tepperwien

---

[10]   At the summary judgment stage, the district court concluded that the plaintiff had "presented evidence sufficient to create a triable issue as to whether the counseling was retaliatory." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427, 445 (S.D.N.Y. 2009).  Although there is some tension between this conclusion and the district court's decision to grant Entergy's Rule 50 motion on retaliation, as the district court noted in its Rule 50 opinion, the "evidence at trial suggesting the counseling amounted to an adverse employment action offered a substantially weaker picture than that presented at the summary judgment stage." *Tepperwien v. Entergy Nuclear Operations, Inc.*, No. 07 CV-433 (CS), slip op. at 10 (S.D.N.Y. Mar. 16, 2010), ECF No. 124.

was allowed to call his lawyer, and someone from the lawyer's office was permitted to participate in the meeting by telephone. *See Vazquez v. Southside United Hous. Dev. Fund Corp.*, No. 06-CV-5997 (NGG)(LB), 2009 WL 2596490, at *12 (E.D.N.Y. Aug. 21, 2009) ("Courts interpreting *Burlington Northern* have held that empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions.").

Barry's comment and stare during the employee meeting are not materially adverse actions. *See Burlington*, 548 U.S. at 68 ("'[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable.'" (quoting 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 669 (3d ed. 1996))); *Martinez v. N.Y.C. Dep't of Educ.*, No. 04-CV-2728 (LTS)(DFE), 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008) ("[I]ncidents where [supervisor] publicly yelled at [plaintiff] for various reasons or called him 'shit' . . . constitute, as a matter of law, the sorts of petty slights and personality conflicts that are not actionable."). Barry's use of a false reason to bring Tepperwien in for a meeting to discuss his complaint to the NRC -- a meeting that Tepperwien surely would have wanted to attend anyway --

was hardly the kind of action that would dissuade a reasonable employee from complaining. Even assuming Barry's motive was retaliatory, the method by which he summoned Tepperwien to the meeting was not in itself a material adverse action.

Finally, the switch to the night shift was not materially adverse because, as his own testimony makes clear, Tepperwien requested it. During the outage, the day shifts were combined, and as a consequence Tepperwien was scheduled to work with Messina. Tepperwien met with O'Hara, the union shop steward, to complain, and O'Hara suggested switching to nights. After speaking with his wife, Tepperwien agreed to make the request, in part because he would have every weekend off. Tepperwien told O'Hara that he would take the shift change, O'Hara made the request to Barry, and Barry granted it. Even after the outage ended, Tepperwien "decided to stay on nights." Hence, the record shows clearly that Tepperwien asked to be moved to the night shift, and there is nothing in the record to suggest that he ever objected to working nights or that he ever asked to be moved back to the day shift.

4. *The Actions in the Aggregate*

While the actions fail individually to provide a basis for a reasonable jury to conclude that Tepperwien was

subjected to material adverse employment actions, they also fail in the aggregate. Individually the actions were trivial, and placed in context they remain trivial. Taken in the aggregate, the actions still did not adversely affect Tepperwien in any material way. "Zero plus zero is zero." *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998); *cf. Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 763 (7th Cir. 2001) ("And it is simply not true, we want to emphasize, that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero.").

The context is also significant. The security unit at Indian Point was akin to a law enforcement or quasi-military unit, with a chain of command, lieutenants and chiefs, handcuffing exercises, the deployment of weapons, and the use of BREs. The task of securing a nuclear power plant raised significant safety concerns not found in most work environments, and, understandably, there was little tolerance for mistakes and rule violations, or even perceived mistakes. It is not surprising that Tepperwien was treated in a rough and tumble manner rather than with kid gloves or in a genteel fashion. *See Hicks*, 593 F.3d at

165 (noting that "'context matters'" when evaluating whether a action is "materially adverse" (quoting *Burlington Northern*, 548 U.S. at 69)).

Viewing all of the actions in the aggregate, we conclude that a reasonable employee in Tepperwien's situation would not have been deterred from engaging in protected activities. Indeed, while the test is an objective one, it is relevant that Tepperwien himself was not deterred from complaining -- he complained numerous times. Moreover, Tepperwien acknowledged, after all the incidents and when it was clear that he was leaving Entergy, that he would consider working for Entergy again and that overall he was satisfied with his job at Entergy.

Accordingly, we hold that the district court properly granted Entergy's motion for judgment as a matter of law dismissing the retaliation claim.

B.  *Punitive Damages*

Our decision above obviates the need to reach the punitive damages claim. Nonetheless, we discuss the claim because punitive damages were the only damages awarded by the jury, and Tepperwien's lack of entitlement to punitive damages is clear.

Punitive damages are available under Title VII where an employer discriminates or retaliates against an

employee with "malice" or "reckless indifference" to the employee's federally protected rights. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) (quoting 42 U.S.C. § 1981a(b)(1)); *see Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101-02 (2d Cir. 2001). A plaintiff can satisfy this burden by presenting evidence that the employer discriminated (or retaliated) against him with "conscious knowledge it was violating the law," or that it engaged in "'egregious' or 'outrageous' conduct from which an inference of malice or reckless indifference could be drawn." *Farias*, 259 F.3d at 102.

Even where a plaintiff establishes malice or reckless indifference, a corporate defendant may still avail itself of an affirmative defense. An employer can avoid liability for punitive damages by showing that it "[1] had an antidiscrimination policy and [2] made a good faith effort to enforce it." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001). In *Kolstad*, the Supreme Court made clear that, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" 527 U.S. at 545 (quoting *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, *J.*, *dissenting*)).

-34-

The jury's award of $500,000 in punitive damages on Tepperwien's retaliation claim was wholly without basis. Tepperwien presented little if any evidence of malice or reckless indifference or egregious or outrageous behavior on the part of Entergy. He relies principally on Barry's conduct, including Barry's actions and statements discussed above. But for the same reasons that we conclude that this conduct was not materially adverse, we conclude, as a matter of law, that this conduct was not a sufficient basis for an award of punitive damages. While Barry surely could have treated Tepperwien more delicately, his conduct did not evince a reckless disregard for Tepperwien's federally-protected rights. To the contrary, Barry was very much a part of Entergy's effort, as discussed below, to address Tepperwien's concerns.

As the district court concluded, and as a reasonable jury could only so find, Entergy made a good-faith effort to comply with its obligations under Title VII. It had an antidiscrimination and antiretaliation policy. All its employees, including management employees, received training on its anti-harassment policy. It provided its employees with numerous avenues to report instances of discrimination or retaliation or harassment.

When Tepperwien complained to HR in November 2004 of physical abuse by Messina, Entergy investigated the

matter carefully, and even though the charge was not sustained, Entergy took concrete action: distributing a department-wide memo (signed by Barry) reminding employees of the company's expectations regarding workplace behavior; requiring all security department employees to attend training; and removing Messina as range instructor. When Tepperwien complained to his supervisor in August 2005 that Messina had touched his hair inappropriately, Entergy investigated swiftly, and Messina was walked off-site and placed on administrative leave (albeit paid) the same day. Messina was sent for psychological evaluation (by Barry) before he was reinstated, and when he was reinstated, a written reprimand was placed in his personnel file.[11]

When Tepperwien filed a complaint with the NRC in January 2006, Entergy management convened a meeting to discuss his concerns; Tepperwien was permitted to have a representative from his lawyer's office participate in the meeting by telephone. And when Tepperwien complained to the ECP in February 2006, Taggart met with him, listened to his concerns, investigated, and responded in writing. The counseling letter was rescinded. Tepperwien noted afterwards that he was "satisfied" with his interactions

---

[11] Entergy also recommended that Messina seek counseling. It appears that he never did, but Entergy did not follow up.

with ECP and with the response to the concerns he had raised. Tepperwien asked to be moved to the night shift so that he could avoid Messina, and Entergy -- with Barry making the decision -- agreed.

Far from acting maliciously or indifferently or egregiously, the evidence showed, and a reasonable jury could only find, that Entergy sought to, and did, address Tepperwien's complaints in good faith. It gave him an opportunity to be heard, it listened to his concerns, and it took concrete steps to address them. The district court correctly held that, even assuming the jury could have reasonably found for Tepperwien on his retaliation claim, Entergy was entitled to judgment as a matter of law on the award of punitive damages.

### CONCLUSION

We have considered Tepperwien's remaining arguments and reject them as being without merit.

For the reasons set forth above, the judgment of the district court is affirmed in all respects.

JOHN GLEESON, District Judge, dissenting.

A jury found that Entergy retaliated against James Tepperwien for complaining of Vito Messina's ongoing sexual overtures and unwanted sexual contacts. It also found that Entergy's treatment of Tepperwien warranted punitive damages. These verdicts are entitled to deference. In passing on Entergy's application for judgment as a matter of law, we are obligated to view the evidence in the light most favorable to Tepperwien, *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998), and the majority holds that we may grant the motion only if the evidence, so viewed, is so deficient that the jury's findings could only have been the result of sheer surmise and conjecture. Op. at 24 (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)). Because the majority ignores the first of these principles and pays only lip service to the second, I respectfully dissent.

A.  *Factual Background*

Viewed in the light most favorable to Tepperwien, evidence presented at trial established the facts set forth below.

Beginning in 2003, Vito Messina, who occupied a position superior to Tepperwien's at Indian Point, began sexually harassing him. Messina had been sexually harassing men at Indian Point for many years. Messina told

Tepperwien that he wanted to have sex with him and that Tepperwien could get him better jobs at the plant if he acceded. The ongoing abusive sexual banter graduated in November 2004 to a sexual assault, which is when Tepperwien began to complain.

On November 16, 2004, Tepperwien reported the sexual assault to Human Resources. This was his first complaint of sex discrimination, and the first "factfinder" against him soon followed. Essentially, a factfinder at Indian Point is a direction to an employee to show cause why he or she shouldn't be found to have violated a rule. For example, as Entergy employee and union shop steward Alfred Hicks explained at trial, "[i]f someone was absent 'x' number of days, the company would ask for a fact-finder to find out why this employee was absent so many days." J.A. 440. Depending on the information gleaned through the factfinder, disciplinary action, including termination of employment, could follow.

The first factfinder against Tepperwien subjected him to an allegation that he had abused his sick time privileges while he was hospitalized due to a work-related injury from early December to December 28, 2004. The alleged "abuse" was his failure to report his hospitalization within 24 hours, even though he could not

have reported it during that period because he was in critical care for internal bleeding.

In August 2005, Messina, unpunished and undeterred, came on to Tepperwien again. They were together in a work vehicle when Messina said he found Tepperwien attractive and put his hands on Tepperwien's shoulders, neck and hair. When Tepperwien protested, Messina insisted that Tepperwien really wanted Messina to touch him just as much as Messina wanted to do the touching. Besides, Messina said, "I'm going to touch you as much as I want, and there's nothing you can do about it." J.A. 205. When Tepperwien continued to object, Messina responded by saying how "cute" he was being by "playing hard to get." J.A. 205.

Tepperwien reported the incident immediately. The initial response of the Site Security Superintendent, John Cherubini, was, "[W]hy didn't you punch him out?" J.A. 210. Tepperwien explained that a fight between two armed men could easily escalate into something that would have to be reported to the Nuclear Regulatory Commission ("NRC"), which Cherubini agreed had to be avoided. As for Messina, when he was confronted about Tepperwien's complaint he

3

admitted stroking Tepperwien's hair.  Entergy thereupon "punished" him by placing him on ten weeks of paid leave.[1]

Entergy brought Messina back to work in early November 2005 without taking any steps to protect Tepperwien from him.  Tepperwien complained about this to Terrence Barry, the Security Manager at Indian Point.  Barry first laughed him off and then told Tepperwien that if Messina sexually harassed him again, Tepperwien should report it to management.  Tepperwien observed that he'd done that before, twice in fact, but it hadn't done much good because Messina was once again back in the workplace in close proximity to Tepperwien.  Barry accused Tepperwien of being "overemotional" and threatened to kick *him* off the site.  J.A. 218.

This exchange occurred on November 16 or 17, 2005, and once again a factfinder closely followed Tepperwien's protected activity.  Specifically, in early January 2006 the "missing equipment" factfinder commenced.  Tepperwien objected to the inquiry, claiming he was being falsely accused, and Lieutenant Sanfilippo -- who was conducting the factfinder on behalf of Entergy -- essentially agreed with him.  "Out of all the guys that we should be talking

---

[1]     Messina was also supposed to attend counseling, but he testified that he didn't, and Entergy never followed up on it.

4

to about this," Sanfilippo told Tepperwien, "you're the least likely guy we should be fact-finding." J.A. 237.

Later in January, Tepperwien escalated his complaint of sexual harassment by taking it outside of Entergy to the NRC. Entergy's retaliation escalated as well. The very next week, on January 22, 2006, the missing equipment factfinder was ratcheted up to a "counseling," a sanction that Entergy itself characterizes as "discipline." J.A. 881; J.A. 238. Lieutenant Jason Hettler and Site Security Supervisor James O'Brien conducted the counseling session. Tepperwien told them the counseling was retaliation for going to the NRC the previous week and asked why they were giving him a counseling. They responded that they did not want to be doing it but were ordered to do so by Cherubini.

One day during the following week, Barry was determined to grill Tepperwien about the NRC complaint, but it was Tepperwien's day off. So Barry called Tepperwien and lied to him to lure him into work. Barry said someone was needed on a "regulatory matter" and Tepperwien's name had been "picked out of a hat." J.A. 247. Tepperwien told Barry he had doctors' appointments scheduled for that day, but Barry insisted. Barry falsely assured Tepperwien it was simple matter, lied to him about who would be present, and said he would regard it as a "personal favor" if

5

Tepperwien helped out and it would take but a half-hour of his time.  *Id.*  When Tepperwien came in, Barry and two Entergy lawyers confronted him about the NRC complaint.  Tricked into an obviously adversarial situation, Tepperwien sensibly asked if a record could be made of what was said.  He was told no, and he was further told that if he persisted in the request it would be considered a failure to cooperate and would be grounds for terminating him.  The purported half-hour matter became a hostile three-hour interview about his sexual harassment complaint, at which Entergy's lawyer questioned Tepperwien about, among other things, the January 22 counseling.

Meanwhile, Tepperwien had to deal with having been disciplined in the form of that counseling.[2]  It was a substantial undertaking.  The appeal mechanism was a procedure before the Employee Concerns Program at Entergy.  Tepperwien was advised by Barbara Taggart of that program to consult an attorney before commencing the process, which he did.  He was required to "put everything in writing," J.A. 239, which he did, in a lengthy submission.  He had to

---

[2]    There is no dispute that Tepperwien was subjected to a counseling session on January 22, 2006.  *See* J.A. 881–82 (describing January 22 "conversation" as a "counseling" and a "counseling session"); J.A. 874 ("rescind[ing] the counseling session").  There is similarly no dispute that a counseling session at Entergy constitutes "discipline." *See* J.A. 881–82 (form "document[ing] disciplinary action(s)" and identifying the action at issue as the equipment counseling).

6

meet with Taggart in mid-February to discuss his appeal. Although he finally succeeded in persuading Taggart that he had been improperly disciplined, it took Tepperwien more than six weeks, from January 22, 2006 through March 6, 2006, to remove the stain of the counseling from his record. As Cherubini himself put it after the counseling was rescinded on March 6, Tepperwien was disturbed at the fact that he had to go to Employee Concerns to erase the discipline from his record.[3]

B.  *The Jury Finding of Retaliation*

Viewing the evidence, as we must, in the light most favorable to Tepperwien, there is no justification for the majority's holding that the jury's finding of retaliation amounted to sheer surmise and conjecture. In concluding otherwise, the majority begins by saying that factfinders at Entergy were not, as a matter of law, materially adverse employment actions because they were "common occurrences," that Tepperwien acknowledged factfinders were helpful in most situations, and that "there was good reason for Entergy to initiate" the factfinders against Tepperwien. Op. at 30.

---

[3]  Finally, in mid-March 2006 Tepperwien filed a formal charge with the EEOC. Thus ensued a bogus (and eventually aborted) factfinder regarding allowing an officer who had a strong smell (possibly alcohol) into the facility.

Factfinders were indeed common occurrences, but not for Tepperwien. He had none until he started engaging in protected activity in November 2004,[4] and then they happened like clockwork after each of his complaints about Messina. The majority correctly points out that "[c]ontext matters" in our determination of whether employer action is materially adverse, *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69, 71 (2006), and it is thus relevant to our analysis that factfinders were common at Entergy. However, *Burlington Northern* instructs us that the material adversity inquiry probes the "perspective of a reasonable person *in the plaintiff's position*." *Id.*at 69-70 (emphasis added). Here then, we must consider the perspective of a reasonable person who, like Tepperwien, had never been subject to any factfinders before making a complaint of discrimination.[5] A reasonable person in such a

---

[4] The majority terms the evidence on this point "equivocal," Op. at 31, but it isn't, and not even Entergy suggests that it is. The first factfinder against Tepperwien, which he indeed claims was an act of retaliation, *see* Brief for Appellant at 18, was brought in December 2004, shortly after his first complaint of sexual harassment. Even if the evidence were equivocal, our obligation when confronted with such evidence in this posture is to view it in the light most favorable to Tepperwien.

[5] The majority erroneously claims that Tepperwien's discipline-free history prior to his protected activity goes only to the question of whether Entergy had a retaliatory motive, a question not before us here. Op. at 32. But Tepperwien's employment history is an integral part of the material adversity inquiry because it forms the figurative shoes occupied by the reasonable person we must hypothesize. Indeed, by premising its determination that the factfinders were not materially adverse on

8

position may well have been dissuaded from making a future charge of discrimination, despite the fact that factfinders were common for *other* employees, and the jury acted within reason in so finding.

Second, although Tepperwien indeed testified that in "*most* situations, fact-finders are there to be helpful," J.A. 229 (emphasis added), the clear import of his testimony as a whole is that in *his* situation, the factfinders and the counseling (among other things) were harmful because they raised the specter of discipline and were issued not to address a genuine workplace concern but as punishment for his protected conduct. During one factfinder, Tepperwien told the investigating officers that the factfinder was "just another witch hunt, trying to pin something on me." J.A. 270. He told the officers conducting the missing equipment factfinder that he was being made a "scapegoat," and Sanfilippo essentially agreed there was no basis for the factfinder. J.A. 237. Tepperwien also explicitly told Hettler and O'Brien, who conducted the counseling that followed the missing

its factual finding that they were justified by good reasons, the majority itself acknowledges that evidence of retaliatory motive and evidence of material adversity often cannot be neatly separated. As I explain below, *see infra* 6-7, to the extent that the justification for an employer's action bears on the adverse impact of the action, the evidence of the so-called "good reasons" for the factfinders is insufficient to require us to hold, as a matter of law, that that they were not materially adverse actions.

9

equipment factfinder, that he thought the counseling was retaliation for his complaint the week before to the NRC. In short, the majority's suggestion that Tepperwien himself characterized the factfinders and counseling as "helpful" is an unfair characterization of his testimony as a whole and disregards our responsibility to view the facts in the light most favorable to Tepperwien.

The majority's finding that there were "good reason[s]" for the factfinders usurps the jury's role. The inference that the factfinders were unwarranted efforts to pin something on Tepperwien was supported not only by Tepperwien (though his testimony alone is sufficient to sustain the jury's verdict), but also by Entergy's own investigators. As discussed above, Sanfilippo admitted that of all the people at Entergy he should have been talking to about the missing equipment, Tepperwien was the least likely candidate for a factfinder. And when that bogus factfinder was escalated to a counseling right after the complaint to the NRC, Hettler and O'Brien told Tepperwien they did not want to be subjecting him to the counseling but were ordered to do so by Cherubini. The jury was permitted to conclude from this evidence, from the tight temporal proximity between Tepperwien's complaints and the factfinders and from the overt hostility of Barry towards Tepperwien and his complaints, that the factfinders

10

were not justified by "good reasons" at all but instead served to punish Tepperwien for his protected conduct.

The majority also finds, *as a matter of law*, that not even the counseling of Tepperwien was a materially adverse employment action. Its lengthy and strained reasoning ignores the real-world consequences inflicted on Tepperwien immediately after he took his complaint outside of Entergy to the NRC: (a) the counseling, which was a form of discipline, became part of his employment record; (b) to challenge the discipline, he needed to invoke the grievance procedures of the Employee Concerns Program; (c) at the urging of the Employee Concerns Coordinator, he had to consult an attorney; and (d) the grievance process took six weeks and required him to file a detailed written submission and to submit to an interview with the coordinator.

That's a lot of trouble to go through in exchange for complaining of workplace discrimination. It's certainly enough to dissuade a reasonable worker from making such a complaint. Yet the majority holds that the jury's finding to that effect amounted to sheer surmise and conjecture.

The remainder of the majority's opinion in this regard divides and purports to conquer the various other bad things that happened to Tepperwien on the heels of his

11

complaints about Messina. The result neither fairly characterizes the evidence nor convinces. For example, trivializing the remarkable fact that Tepperwien's complaint that he wasn't being protected from Messina caused Barry to threaten to toss *Tepperwien* off the work site, the majority says the threat "was made after Tepperwien facetiously asked whether he could 'kick Vito in the groin.'" Op. at 36 (quoting J.A. 217). But that leaves out some evidence. Barry's threat came after Tepperwien's statement, but something important happened in between. Specifically, Barry told Tepperwien to use the company's reporting policy if Messina harassed him again. Then Tepperwien, who moments earlier had told Barry that "Entergy's policies on sexual harassment and violence in the workplace are not worth the paper they're written on," protested that he had already "done that twice." J.A. 217. *That's* when Barry made his threat. The jury rationally could have concluded that because Barry's threat immediately followed a discussion about making future complaints, a reasonable person would have been discouraged, if not dissuaded altogether, from making any such complaints.

The most egregious example of appellate-court-as-factfinder is the majority's reliance on Tepperwien's "Separating Employee Survey." *See* Op. at 41. When he

12

left Entergy, Tepperwien indicated on a form that he liked his job and that he'd consider working there again. Without explaining why, the majority finds this useful in determining as a matter of law that Entergy did not subject him to materially adverse employment consequences in retaliation for his complaints about Messina. One obvious defect in this approach is that liking one's job or considering returning to it and reasonably feeling deterred from complaining about sexual harassment are not necessarily inconsistent, let alone mutually exclusive, as the majority suggests. But more importantly, Tepperwien gave testimony explaining his answers on the survey, which the majority fails to mention. When asked why he wrote that he would consider working for Entergy again, he told the jury that he "didn't want to appear to be a disgruntled employee." J.A. 282. He elaborated that when filling out the survey he was "thinking about what was going to happen in the future," was concerned about whether he was "going to be able to go to work in another power plant" or "get another armed security position," and believed the exit survey "could easily follow [him]" as he sought future employment. J.A. 284.

Weighing facts like Tepperwien's exit survey responses and his at-trial explanations of those responses, alongside all of the other evidence in the case, is

13

quintessentially the function of the jury, not a court on post-verdict review. The jury in Tepperwien's case heard about his exit survey, just as it heard Tepperwien's explanations for the answers he gave in that survey, and it found that Tepperwien had been subjected to actions that would dissuade a reasonable worker from complaining of discrimination. Our job here is limited to determining whether the evidence, viewed in the light most favorable to Tepperwien, supports that verdict, not to troll the record for facts that might have supported a different one.

Contrary to the majority's suggestion, protecting employees from retaliation by employers does not amount to treating them "with kid gloves or in a genteel fashion," Op. at 40, or "delicately," *id.* at 43. Nor is Title VII's commitment to such protection diluted when the workplace has security risks, like a nuclear power plant or a law enforcement agency. There is no tension between effective security and requiring an employer to respect an employee's right to make good faith complaints of employment discrimination without being subjected to materially adverse actions by the employer. The majority's needless suggestions to the contrary have no support in logic or our case law, and by demeaning the antiretaliation provision in Title VII they create the potential for mischief in this and other unspecified "contexts" in which employers will be

14

permitted to treat employees in the "rough and tumble manner" in which Tepperwien was treated in this case.  Op. at 40.

Finally, though jury findings are always entitled to great deference, it is hard to conjure a context in which they deserve it more than in this one.  The Supreme Court has emphasized that the determination of whether challenged conduct meets the materially adverse standard is especially fact-intensive.  In *Burlington Northern*, it stated that "the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters.  The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."  548 U.S. at 69 (internal quotation marks omitted).  And earlier this year, in *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863 (2011), the Court stated that "[g]iven the broad statutory text and the variety of workplace contexts in which retaliation may occur, Title VII's antiretaliation provision is simply not reducible to a comprehensive set of clear rules."  *Id.* at 868.  Retaliation claims thus implicate a broad remedial provision, violations of which are determined only after a searching review of all aspects of the challenged actions

15

and the wider context in which they occurred in order to determine the "real social impact of workplace behavior." Jurors are obviously better suited to determining the social impact of contemporary workplace behavior than are judges.  The majority thus not only usurps the proper role of the jury but substitutes for that body a factfinder with significant, perhaps even disabling, institutional limitations.

C.  *The Award of Punitive Damages*

For the same reasons it sets aside the jury's verdict in favor of Tepperwien on the retaliation claim, the majority also sets aside the jury's award of punitive damages.  Op. at 43.  The majority twice repeats its conclusion that a jury could "only find" that Entergy tried in good faith to comply with its obligations under Title VII.  Op. at 43, 45.  I disagree.

The jury reasonably could have inferred employer bad faith from evidence, when viewed in the light most favorable to Tepperwien, that established the following:

- Vito Messina was a problem of long standing in the Indian Point workplace.  He had previously molested O'Hara, Tepperwien's union representative.  And ten years prior to the events giving rise to this case, O'Hara's father (who appears also to have worked at Indian Point) had said "that's just the way Vito is."  J.A. 327.  That "way" was the way Entergy allowed him to be.

- Messina began harassing Tepperwien in 2003.  After a physical sexual assault in November 2004, he

16

began reporting the harassment. However, shortly after each in-house complaint was made, he was hassled by a bogus factfinder, and after the NRC complaint was made, he was hassled by a bogus counseling, all despite a spotless prior record.

- The sexual abuse continued, and in August 2005 there was another physical touching of Tepperwien in a sexually suggestive manner. Tepperwien immediately reported that event, and even though Messina admitted inappropriately touching the victim's hair, his "punishment" consisted mainly of ten weeks of paid leave.

- In fact, Barry had wanted to fire Messina, but after speaking to "unnamed others" at Indian Point he had to reverse course and bring Messina right back into the workplace. J.A. 216-17. The influence of those unnamed others was why Messina taunted Tepperwien by saying "I'm going to touch you as much as I want, and there's nothing you can do about it." J.A. 205.

- When Tepperwien reminded Barry of the prior harassment and asked what was going to be done to protect him against further harassment, Barry's first reaction was to "laugh[] . . . off" the concern. J.A. 439.

- His second reaction was to tell Tepperwien that if Messina molested him again, he should just report it. When Tepperwien protested that that was insufficient because Messina's abuse had previously been reported twice and here he was being welcomed back into the workplace in close proximity to him, Barry accused him of being "overemotional" and threatened to kick him off the site. J.A. 218.

- Right after Tepperwien complained to the NRC in January 2006, Barry lied to him to lure him to a meeting on his day off for the sole purpose of interrogating him about the complaint. Then a company lawyer threatened to fire Tepperwien for insisting on recording what was obviously an adversarial confrontation.

- When a scheduled "outage" (*i.e.*, a turning off of the nuclear reactors) in early 2006 occasioned a

17

meeting involving the security management and staff, Barry made his hostility toward Tepperwien clear to all. In responding to the outage, Entergy put Messina back together with Tepperwien, requiring him to move to the less desirable night shift to escape Messina.[6]

These actions reek of bad faith. The jury was fully justified in weighing all the evidence and concluding that Entergy was more interested in protecting Messina from the consequences of his own sexually harassing behavior than in protecting his victims from retaliation when they brought that behavior to Entergy's (and the NRC's) attention.

D.    *The Amount of Punitive Damages*

The jury in this case heard the typical instructions regarding punitive damages. It was told that such damages may be awarded in its discretion to punish Entergy for outrageous conduct or to deter it from engaging in similar conduct in the future. It was specifically asked to consider whether Entergy "may be adequately punished by an award of actual damages only." J.A. 799. As for the amount of any punitive damages, the jury was

_____

[6]    The majority makes much of the fact that Tepperwien asked to be moved to the night shift. Op. at 38–39. But as the district judge observed at trial, Entergy scarcely deserves credit when an employee it failed to protect "got out of Dodge." J.A. 652. It's one thing if the company separates the harasser from the victim, but "if the separation of the two is done not by the company but by the victim," that hardly helps the company's case. *Id.* As the district court pointed out, the company could have moved Messina to the less desirable night shift instead of requiring by its own inaction that Tepperwien move himself there.

18

told that "in fixing the sum to be awarded, you should consider the degree to which Entergy should be punished for its wrongful conduct and the degree to which an award of one sum or another will deter Entergy or companies like Entergy from committing wrongful acts in the future." J.A. 799-800.

Equipped with those and other instructions, the jury decided that Entergy, whose attorney argued to the jury that there could be no liability unless Tepperwien proved that Messina was a homosexual, needed punishment and deterrence, so it awarded $500,000 in punitive damages. Though the calculation of such damages is anything but a precise science, given Entergy's size, it's difficult to quarrel with the jury's assessment that an award of that size was necessary in order to finally get Entergy's attention, except to say that it exceeds the statutory cap of $300,000, of which the jury was unaware. 42 U.S.C. § 1981a(b)(3). Thus, I would reduce the punitive damages award to $300,000 but otherwise uphold the jury's verdict.

*     *     *     *     *

At first blush the configuration of verdicts in this case seems anomalous. One would think that employer conduct that is sufficiently egregious to warrant $500,000 in punitive damages would also result in damage to the plaintiff, and hence merit an award of compensatory

19

damages.  But a review of the trial record reveals that Tepperwien, a former member of the Strategic Air Command who wore a military bearing on his sleeve, was presented even by his own attorneys as a tough and honorable soldier who refused to buckle under Entergy's mishandling of his complaints about Messina.  The jury's determinations that he needed no compensation despite Entergy's acts of retaliation but that Entergy needed to be punished and deterred cannot reasonably be characterized as the result of surmise or conjecture; to the contrary, they were amply supported by the evidence at trial.  I therefore respectfully dissent.